# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3204

_____

Xuelin Zhuang,                           *
                                         *
            Appellant,                   *
                                         *   Appeal from the United States
      v.                                 *   District Court for the
                                         *   District of Minnesota.
Datacard Corporation,                    *
                                         *
            Appellee.                    *

_____

Submitted:   March 18, 2005
   Filed:   July 12, 2005

_____

Before WOLLMAN, GIBSON, and COLLOTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

    Xuelin Zhuang (Zhuang) appeals from the district court's[1] grant of summary judgment to Datacard Corporation (Datacard) on her employment discrimination claims. These claims allege violations of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 629 *et al*, and the Minnesota Human Rights Act, M.S.A. § 363.03. We affirm.

_____

    [1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

## I. Background

Zhuang is female and was born in China in 1954. She worked for Datacard from May 1997 until she was terminated in September 2002. Datacard manufactures secure identification cards and credit cards, and its operations center on the work of software developers (developers) and software test engineers (testers). Developers write computer codes. Testers ensure that those codes operate as intended. Although separate positions, each entails the same pay scale and the prerequisites for both are identical—a bachelor of science degree and three to five years of experience. Zhuang holds a bachelor of science degree in electrical engineering and a masters degree in software engineering, and her past experience included developing software test code and designing and testing software. Initially hired by Datacard as a tester, Zhuang applied for and received a transfer to a developer position in 1998.

As a tester, Zhuang's performance review stated that she "meets/exceeds" expectations. Her supervisor noted that Zhuang "makes very good comments and suggestions…[,] is good about requesting clarification when she doesn't understand something…[,] is soft-spoken and this often results in other team members interrupting her or dominating the conversation…[and] needs to find a way to minimize the occurrence of this which should also work to resolve the perception that she is shy or quiet." When she became a developer, Zhuang initially performed tester functions. Her new supervisor, Jay Nelson (Nelson) in her March and April 1999 performance reviews concluded that she "meets/exceeds" expectations, although in the first of these reviews he noted that he would like her to improve her written communications and notify him earlier of her decisions on the job.

In March 2000, Zhuang became part of the Graphical User Interface (GUI) team developing software for the Zenith Project, a software program intended to make Datacard's products operate more efficiently. Three other Datacard employees worked on the GUI team, along with five outside contractors. The contractors had knowledge of the Java computer programming language and were considered cost-

efficient to employ. Zhuang was the only non-Caucasian member of the GUI team. In reviewing Zhuang's work as a developer, Karen Kensok noted that she "meets" expectations, and suggested that she improve her programming skills in specific programs and participate more actively in meetings.

In early 2001, Datacard implemented the Critical Chain Management System (the System), a scheduling process that tracked the process of Datacard's projects for the purpose of ensuring their timely completion. Pursuant to System protocol, Datacard gave stuffed toy monkeys to the employees who were furthest behind in their tasks. Embodying the metaphorical "monkey on one's back," these toys served as scarlet letters, singling out those who were disfavored within the workplace. For a variety of reasons, many team members on the Zenith Project, including Zhuang, fell behind the System's schedule; however, Zhuang never received a monkey.

Nonetheless, Steve Pothast (Pothast), the manager of the Zenith GUI team, stated that Zhuang was having trouble completing her tasks on time and noted that several team members had expressed concern regarding Zhuang's ability to understand work assignments. In Zhuang's June 2001 review, Kensok noted that she "meets" expectations, and commented that she has done an "excellent job" in certain areas but needed opportunities for gaining communication and leadership skills. In July of 2001, Pothast assigned a contractor with experience in the Java programming language to work with Zhuang as a mentor. In August, Pothast sent Zhuang a letter detailing areas in which she needed to improve, including troubleshooting skills, confidence in asking questions, and understanding why things are done instead of seeking "just the quick fix." After six to eight weeks, Pothast determined that Zhuang's skills had not improved and that they did not meet the requirements of a software developer position. Pothast informed Zhuang that she would receive negative feedback on her upcoming performance review and that, but for her mentor, she would get a monkey every week. According to Zhuang, Pothast told her that she

"d[id] not have potential for improvement" and that he did not think technical training would help her.

On October 5, 2001, Pothast presented Zhuang with two options: she could remain a developer on the Zenith Project and be placed on a performance improvement plan and a sixty-day probation if her performance did not improve; or, she could become a tester on the Zenith GUI team. If she stayed in her current position, he could not guarantee her employment. Zhuang noted that the suggestion that she take a tester position hurt her feelings, and stated, "I was forced to leave my developer job and [that] ma[de] me look very bad." Pothast stated that he had examined Zhuang's skill set and past successes, and had "basically created a position in the test group where there was a need."

On October 9, 2001, Zhuang complained to Datacard's human resource department as follows: she had been asked to take on tester duties when she was first hired as a developer; false information about her work history provided by Nelson had led to higher expectations being placed upon her; and Pothast had humiliated her by saying that she would not be a successful developer, that technical training would not help her, that she should go to an English as a Second Language class, and that she was "just different from other people." Zhuang then took the tester position, in which she received work assignments from Connie Johnson (Johnson), a woman with less education than Zhuang. Zhuang's salary, job rank, and benefits did not change.

In Pothast's October 29, 2001, review, Zhuang received a "requires development" rating. Pothast stated that Zhuang's deficiencies related to maintaining her schedule, depending on others, working independently, solving problems, and waiting too long to seek help. Zhuang objected to Pothast's comments on her work and told him that the review was unfair. In April 2002, Pothast became the manager of the software testers, the group to which Zhuang now belonged.

-4-

On April 8, 2002, Zhuang filed her first of two discrimination charges with the Equal Employment Opportunity Commission (EEOC), alleging that she had been discriminated against on the basis of her race, sex, national origin, and age. Her factual basis for the charge alleged that she was "subjected to different terms and conditions of employment than White, young, American employees," "forced to transfer into the position of Tester," and told that "no amount of technical training would help" her. She did not specify an adverse action. An EEOC mediation session was carried out on June 20, 2002, with Zhuang and Datacard representatives as parties. Among Datacard's representatives was Karmen Nelson, a human resources consultant and employee resources manager. At the conclusion of the mediation, Zhuang tentatively agreed to settle her claims, but then rescinded the agreement one week later.

In mid-2002, Jim Goodland (Goodland), the Vice President of Software Development, was instructed to reduce his staff. Financial concerns had led Datacard to institute a series of lay-offs beginning in 1997 and a company-wide restructuring effort had begun. Karmen Nelson explained that "many, many, many employees had been let go in the preceding time frame" and noted that "the company was not doing well." In July or August, 2002, Goodland and Karmen Nelson considered which employees to terminate, using a host of criteria—such as Datacard's business needs, employee performance, and what types of skills Datacard would require of its employees as it moved forward—to aid their deliberations. Additional criteria was supplied by a "skills matrix" that evaluated Datacard employees in nine areas: performance trend, leadership, technical skills, specific knowledge, communications and teamwork, productivity, work quality, meeting commitments, and knowledge of how the customer works. Zhuang was ranked near the bottom of the skills matrix, below Johnson. Pothast did not participate in the selection process, although his performance evaluations informed Zhuang's ranking within the skills matrix. Goodland and Karmen Nelson discussed Zhuang's EEOC complaint in addition to her job performance and skill set. Forty employees, including Zhuang, were selected for

termination. Several white males from within Zhuang's group were also among the forty employees.

On July 11, 2002, Karmen Nelson initiated Datacard's termination procedure for Zhuang. On August 6, 2002, Zhuang was notified that she would be terminated effective September 3, 2002, along with thirty-nine other Datacard employees. Zhuang met with Goodland and recalled being told that "the company needs positive high-energy people." Although the discussions that led to Zhuang's termination occurred in July or August of 2002, Datacard produced during discovery a printout of an e-mail dated May 2, 2002, from Mary Kohman (Kohman), Datacard's Senior Payroll Clerk, which contained Zhuang's name and the subject heading, "TERMINATION NOTIFICATION (CONFIDENTIAL)." After discovery, Datacard submitted a printout of the same e-mail, albeit with a date of September 3, 2002. Datacard claims that this was the e-mail actually sent to notify Zhuang of her termination. According to Datacard, the first e-mail printout that it produced was a copy of a template, not the e-mail received by Zhuang. Kohman testified that she created the e-mail template on May 2 for notifying Datacard personnel about departing employees and that she did not learn of Zhuang's impending termination until late August. Kohman further specified that it was not until September 3, 2002, that she entered Zhuang's name into the template e-mail, printed a copy for her file, and sent the e-mail.

Zhuang filed her second EEOC claim on November 5, 2002. She reasserted her original claims and alleged further that Datacard retaliated against her. "My lay-off was in reprisal for my Charge of Discrimination," she wrote. Furthermore, she alleged that being forced to work under Johnson adversely impacted her career development, noted that Pothast, whom she had charged with discrimination in her first EEOC complaint, had become her manager once again, and claimed that although she had been informed that her position was to be eliminated due to business reasons, young white male contractors were hired to take over her duties.

-6-

## II. Discrimination

We review *de novo* the district's court grant of summary judgment. <u>Shanklin v. Fitzgerald</u>, 397 F.3d 596, 602 (8th Cir. 2005). We view the evidence in the light most favorable to the non-moving party and conclude that summary judgment was proper only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. <u>Id.</u>; Fed. R. Civ. P. 56(c). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon [] mere allegations or denials." Fed. R. Civ. P. 56(e).

The district court correctly ruled that Zhuang did not establish a prima facie case of discrimination. To establish a prima facie case of the various types of discrimination she alleges, Zhuang must show the following: (1) she was a member of a protected group, (2) she was meeting the legitimate expectations of her employer, (3) she suffered an adverse employment action, and (4) there are facts that permit an inference of discrimination. <u>Cherry v. Ritenour Sch. Dist.</u>, 361 F.3d 474, 478 (8th Cir. 2004). The first element is uncontested with regard to each type of discrimination alleged.

Zhuang claims that she suffered three adverse employment actions. The first is a series of events that included being assigned a mentor and receiving negative performance reviews, the second is her transfer to the Zenith Test Group, and the third is the termination of her employment. Her first argument on this matter regarding her mentor and her performance reviews is unavailing. We do not believe that Zhuang has provided any evidence, as opposed to mere allegations, that the mentor and the reviews did not in fact constitute a benefit to her, an employer's method of giving her feedback and a chance to improve.

Even assuming that Zhuang's transfer to the tester position was involuntary, Zhuang's second argument fails as well. Because "[a] transfer involving only minor changes in working conditions and no reduction in pay or benefits [does] not

constitute an adverse employment action," Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997), we hold that Zhuang has failed to make the necessary showing on the issue of whether she suffered an adverse employment action. It is uncontested that her pay and benefits remained the same when she returned to a tester position. She has failed to raise any genuine issue regarding working conditions that could alter our conclusion in this regard. "Changes in duties or working conditions that cause no materially significant disadvantage…are insufficient to establish the adverse conduct required to make a prima facie case." Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994). Zhuang's arguments in this regard amount to a personal preference for one position over the other. Additionally, we note that rather than tending to show an adverse employment action, Zhuang's option (whether forced or voluntary) to transfer to a position she had performed well in the past constitutes evidence that Datacard was attempting to provide Zhuang with a way to retain her employment.

With regard to Zhuang's final argument on this claim, termination does constitute an adverse action. Datacard has articulated legitimate, nondiscriminatory reasons for its actions, however, as required by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), and Zhuang has not presented probative evidence that Datacard's reasons are pretexts for unlawful discrimination. See id. (describing how these various burdens of proof shift from one party to another). "There is nothing inherently discriminatory" in Datacard's reliance on Zhuang's recent performance evaluations, see Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 780 (8th Cir. 1995), and Zhuang has not shown that she was meeting the legitimate expectations of her employer or that there are facts that permit an inference of discrimination.

As to the second and fourth elements of the prima facie case, Zhuang presents various pieces of circumstantial evidence that are insufficient to show that she was meeting her employer's legitimate expectations or to provide an inference of discrimination. Although Zhuang received more positive performance evaluations

during her initial tenure as a tester, this does not constitute evidence that those who supervised her in her later role as a developer evinced discriminatory intent by giving her less positive reviews, nor does it suggest that she was meeting her employer's legitimate expectations at the time she was terminated. See Miller v. Citizens Sec. Group, Inc., 116 F.3d 343, 346 (8th Cir. 1997) (concluding that performance evaluations from April 1990 to January 1991 were not evidence that an employee was meeting his employer's legitimate expectations because those evaluations were too far removed in time from his March 1992 discharge). Similarly, much was made of the fact that Zhuang never received the dreaded monkey. Although Zhuang may not have been the person who was furthest behind in her work, she was reportedly behind in her work, and we do not find the fact that she was not the furthest behind to be probative of discriminatory intent or pretext. Those who executed the company-wide layoff, of which Zhuang was a casualty, used many criteria in their decisional processes. We, like the district court, refuse to "sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgment involve intentional discrimination." Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999).

With regard to facts permitting an inference of discrimination, we find none. An innocuous discussion about age at a contractor's birthday party at work, for example, is not evidence of discrimination. Such erroneous perceptions abound in this case and are too numerous to address in their entirety. It is true, for example, that problems with Zhuang's communication skills were cited in performance evaluations and that Zhuang may have been told that she was "different." It would be unreasonable, however, to equate decisions and comments based on this with discrimination. No doubt many native English speakers could be cited for such problems, and many employees besides Zhuang, including several white males from Zhuang's particular work group, were also terminated. We require probative evidence of intentional discrimination, not mere allegations based upon facts that as a matter of law are insufficient to establish discrimination.

We conclude that summary judgment was appropriate because Zhuang has failed to establish the second and fourth elements of her prima facie case. Moreover, even had she established a prima facie case, we could not conclude on the basis of the evidence presented that her employer's legitimate, nondiscriminatory reasons for terminating her were pretexts.

To the extent that Zhuang sought to raise a hostile work environment claim on appeal, we note that it has only been raised in her reply brief and that, in any event, such a claim is without merit, as nothing in the record suggests that she was subjected to harassment. See Elmahdi v. Marriott Hotel Services, Inc., 339 F.3d 645, 652 (8th Cir. 2003) (discussing the elements of such a claim and the level to which harassment must rise to be actionable).

## III. Retaliation

Zhuang alleges that Datacard retaliated against her for filing the EEOC claim. In order to establish a prima facie case of retaliation, Zhuang must show that (1) she engaged in statutorily protected conduct; (2) suffered an adverse employment action; and (3) there is a causal connection between her protected conduct and the adverse employment action. EEOC v. Kohler Co., 335 F.3d 766, 772 (8th Cir. 2003). The first and second elements are satisfied by virtue of Zhuang's complaint to the EEOC and her termination. There remains the question whether there is a disputed issue of material fact as to the existence of a causal connection between her EEOC complaint and her termination.

Although Datacard's employees have proffered persuasive explanations for why the May 2, 2002, e-mail did not correspond to the date on which Zhuang was identified for termination, it would be improper to credit the moving party's version of the facts on summary judgment. Zhuang points out that there are formatting differences between the copy of the May 2 e-mail and the September 3, 2002, e-mail produced by Datcard even though the employee who sent the e-mail claims the same

-10-

template was in use until 2003. Therefore, there is a disputed issue of fact regarding the e-mail. We conclude, however, that the date of the e-mail in the context of this case is not a material fact. More than a temporal connection is generally required to present a genuine factual issue of retaliation. Peterson v. Scott County, 406 F.3d 515, 524 (8th Cir. 2005). Although such close temporal proximity between the date of an EEOC claim and a decision to fire an employee could conceivably support a finding that a plaintiff had carried her burden on the third element, see, e.g., Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001) (referencing cases that accept mere temporal proximity as sufficient evidence of causality to establish a prima facie case), it does not do so here. A causal connection implies not just a relationship between two events, but a certain type of relationship in which one event is generated by the other. Temporal proximity can point to such a relationship, but the fact of two events occurring close in time does not eliminate the possibility of a mere coincidence. The closer in time two events are found to occur, however, the greater the odds become that one is caused by the other or that both are caused by a separate, third event. By showing that the date of the e-mail identifying her for termination is disputed, Zhuang has focused upon the unlikelihood of a mere coincidence in the filing of her April 8, 2002, EEOC complaint and the May 2, 2002, termination e-mail.

The only possible evidence of a causal relationship is Karmen Nelson's acknowledgment that when she met with Goodland to discuss who was being selected for termination they "would discuss anything that [they] saw," including Zhuang's EEOC claim. Dep. of Karmen M. Nelson, app. at 174. Nelson further acknowledged that Goodland "would have known…that [Zhuang] had filed an EEOC charge." Id. Whatever evidentiary value the fact of an employer's knowledge and discussion of an employee's EEOC claim might have in another case, the question here is whether the fact of the complaint was a causal factor behind Datacard's decision to terminate Zhuang. We conclude that Nelson and Goodland's discussion of Zhuang's EEOC claim is not probative of retaliation in this case. There is no evidence that their discussion was marked by retaliatory animus, and thus any finding of retaliation

-11-

would necessarily be based upon mere conjecture and would amount to a determination that an employee can insulate herself from an otherwise valid termination by filing an EEOC complaint.

As did the district court, we conclude that even if Zhuang had established a prima facie case of retaliation, her evidence was insufficient to show that Datacard's legitimate, non-retaliatory reason for terminating Zhuang was a pretext for retaliation. See Peterson, 406 F.3d at 524 (discussing the applicable burden-shifting framework). Datacard's proffered explanation pointed out that the company was not economically healthy and was reducing its staff. It also pointed out that Zhuang had been singled out for negative job performance, was not performing well at the time, and had ranked poorly on the skills matrix used to assess which employees should be terminated. Given the absence of any retaliatory motive on Datacard's part, that explanation is valid, for it is a company's prerogative to make business decisions in accordance with economic need and employee job performance and Zhuang has failed to provide evidence of pretext. It is this same paucity of evidence in Zhuang's favor that not only prevented her from making out her prima facie case, but would further prevent her, had such a case been made out, from prevailing on the issue of pretext.

Accordingly, we affirm the district court's grant of summary judgment on Zhuang's retaliation claim.

### IV.  Motion to Strike

We review a district court's denial of a motion to strike for abuse of discretion. Dall v. United States, 957 F.2d 571, 572 (8th Cir. 1992). Zhuang argues that Datacard should not have been permitted to introduce the September 3, 2002, e-mail into evidence on the ground that Datacard failed to disclose the e-mail when Zhuang requested all such documents during discovery. The district court credited Datacard's explanation that the May 2 e-mail produced in discovery was the product of a technical error and admitted a copy of the new e-mail, bearing a September 3, 2002,

date, along with additional affidavits on the issue. The district court postponed oral argument, permitted Zhuang to conduct additional discovery, and allowed supplemental briefing on the matter. It was not an abuse of discretion for the district court to conclude that Datacard's failure to produce the September 3 e-mail in a timely fashion was harmless and that a substantial justification for this failure was offered. See Fed. R. Civ. P. 37(c)(1).

## V. Conclusion

The judgment is affirmed.

_____