# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 04-2979

| | | |
|---|---|---|
| Darold Maxfield, | * | |
| | * | |
| Appellant, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Eastern District of Arkansas. |
| | * | |
| Cintas Corporation No. 2, | * | |
| | * | |
| Appellee. | * | |

Submitted: April 11, 2005
Filed: October 31, 2005

Before COLLOTON, McMILLIAN, and BENTON, Circuit Judges.

McMILLIAN, Circuit Judge.

Darold Maxfield appeals from a final judgment entered in the District Court for the Eastern District of Arkansas granting summary judgment in favor of his former employer, Cintas Corporation No. 2 ("Cintas"), on his claims of employment discrimination based on race in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) et seq., 42 U.S.C. § 1981, and the Arkansas Civil Rights Act of 1993, Ark. Code Ann. § 16-123-101 et seq. ("ACRA"), and employment discrimination based on military service in violation of the Uniform Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 et seq. ("USERRA" or the "Act"). For reversal, Maxfield argues that

the district court erred in holding that (1) he failed to present evidence to show that Cintas's proffered nondiscriminatory reasons for adverse employment actions were pretexts for race discrimination under the third step of the framework set forth in McDonnell Douglas v. Green, 411 U.S. 792, 805-06 (1973) (McDonnell Douglas), and (2) he failed under USERRA to present evidence to show that his military service was a motivating factor in Cintas's actions. For the reasons discussed below, we affirm in part and reverse and remand in part.

Jurisdiction was proper in the district court based upon 28 U.S.C. §§ 1331, 1343. Jurisdiction is proper in this court based upon 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(a).

**BACKGROUND**

Viewed in the light most favorable to Maxfield, the facts and all reasonable inferences therefrom are as follows. Maxfield, an African-American, has served in the United States Army, either in active duty or reserve status, since 1985. Randy Lewis, general manager of Cintas's Maumelle, Arkansas, facility, hired Maxfield on July 26, 1999, as a service sales representative at a salary of $550.00 per week, plus a quarterly bonus. On February 1, 2000, Maxfield accepted a position as a production supervisor at an annual salary of $33,800.00 with no bonus or commission opportunity. On May 22, 2000, Maxfield accepted the position of facility outside sales representative (FOS) with a weekly draw of $650.00, plus commissions on sales and quarterly bonuses. A draw was essentially a salary that was advanced on expected sales. However, if commissions on sales were less than the draw, an employee incurred a deficit. During his first nine months of work in the FOS position, Maxfield's commissions exceeded his draws. In his best month, December 2000, he earned $7,437.91 in commissions and bonuses. However, in May 2001, Maxfield's draw exceeded his commission, resulting in a deficit of $857.45. His deficit increased in June to $1,914.46, before he was able to reduce it to $1,339.79 in July 2001.

On July 15, 2001, Lewis granted Maxfield a military leave of absence for reserve duty from July 15 to September 28, 2001. During the leave, someone from Cintas, who identified himself as Maxfield's "boss," called the military base and spoke to Sergeant First Class Tarrance Grissett, who was responsible for preparing Maxfield's orders, asking whether Maxfield had reported for duty and whether it was "imperative" for him to be on military leave at that time. Appellant's App. at 405. Grissett responded that Maxfield was present and that his presence was "imperative." Id. On July 24, 2001, Rick Johnson, the human resources manager, and Lewis went to the base so that Maxfield could complete the paperwork for the leave and to discuss his sales deficit. Lewis and Johnson told Maxfield that he could take vacation leave while he was on military leave, and records reflect that he did so. When Maxfield returned from leave in August, his debt was $1,360.70. Lewis, with input from Randy Lunsford, who had been Maxfield's supervisor in the FOS position, transferred Maxfield from the FOS position to the position of proactive service trainer (PST) at a salary of $650.00 per week, plus quarterly bonuses. Lunsford noted on a document that the transfer was unrelated to Maxfield's military leave.

On January 24, 2002, Cintas granted Maxfield a military leave of absence through June 15, 2002. In March 2002, Cintas eliminated the PST positions at the Maumelle facility, as well as at other facilities in the Southeast. Lunsford testified that the PST positions went "back and forth," explaining that in the past Cintas had eliminated the positions but then would reinstate them. Id. at 358. When Maxfield returned from leave in June, Cintas placed him in a telemarketing position where he earned an hourly rate of $16.25, plus overtime pay and weekly commissions.

On Monday, August 19, 2002, about fifteen minutes before he was to start work at Cintas, Maxfield called Lewis, his immediate supervisor, and requested military leave for August 19, 20, and 23, 2002, explaining that he had received orders over the weekend. Maxfield faxed the orders, and Lewis approved the leave. Pursuant to Lewis's directions, on August 21, Maxfield met with Lewis at Cintas and filled out the

3

paperwork for the leave. Lewis, who was responsible for recording absences on Maxfield's attendance calendar, marked the calendar to show that Maxfield was on military leave for those days. After leaving Lewis's office, Maxfield saw Lisa Wilson, the office manager, and asked her what he needed to do in order to take vacation leave while on military leave. Wilson told him to talk to Tracey Anderson, the payroll clerk. Maxfield then talked to Anderson, telling her that he wanted to use accrued emergency and vacation leave while he was on military leave. Id. at 82. Anderson told Maxfield she would take care of his request.

Cintas has a category of leave entitled "Sick Pay/Bereavement/Jury Duty/Emergencies." The employee manual provides that "sick pay is intended to ensure against loss of income due to sickness, accidents, emergencies, court appearances . . . according to the judgment of [an employee's] immediate supervisor." Appellee's App. at 5. Johnson, the human resources manager, testified that an employee has the right to take accrued sick and vacation leave while on military leave, that a supervisor does not have the authority to refuse the request, and that managers had been so instructed. Appellant's App. at 156-57.

On Monday, August 26, 2002, Anderson gave Maxfield his weekly time report to sign. In late July or early August 2002, Cintas began requiring hourly employees to sign weekly time reports if any changes had been made to the report after it had been generated by a computer program. The signing requirement did not change Cintas's policy that a supervisor had to approve all leave requests and the weekly time report. Id. at 125, 133. On August 26, Maxfield signed the weekly time report, on which Anderson had noted that Maxfield had been "out sick" on August 19 and 20 and "on vacation" on August 23.

Anderson gave the signed report to Wilson, who on August 26 gave it to Lewis for his approval. Lewis testified that he was surprised to see that Maxfield had taken sick and vacation leave while he was on military leave. Lewis stated that he "could

4

not figure out how in the world [the weekly time report] would have showed . . . that [Maxfield] was out sick when he wasn't out sick and how he took a vacation day when he didn't take a vacation day." Id. at 360. Lewis testified that Cintas did not allow an employee to use "sick/emergency" leave while on military leave, id. at 261, and believed that by requesting sick leave from Anderson, Maxfield was trying to circumvent the "system" in an attempt to claim two extra sick days and one extra vacation day. Id. at 270. Lewis theorized that by requesting the paid leave from Anderson, Maxfield thought Lewis would not see the weekly time report and not record the paid days off on the attendance calender, thus believing he could request two extra sick days and one extra vacation day from Lewis at a later time. In Lewis's words, Maxfield thought: "I've still got three days for the next year that I can use if I need them because [Lewis] didn't record them." Id. at 272.

On August 26, 2002, Lewis suspended Maxfield, telling Maxfield that "he had stole[n] from the company." Id. at 281. According to Lewis, after a two-day investigation, he concluded that Maxfield had "committed a serious policy violation" by requesting sick leave from Anderson, the payroll clerk, and by doing so "had devised a scheme to rob the company of a financial benefit." Id. at 269. However, during the investigation, Lewis did not talk with Anderson to ask whether Maxfield had told her he wanted to take accrued sick/emergency and vacation leave while on military leave or whether he had called in "sick." Id. at 267-68. In addition, during the investigation, Lewis never learned that Cintas allowed employees to take accrued sick days while on military leave. Id. at 263. After discussing the matter with Todd Gregory, a Cintas group vice president, on August 28, Lewis met with Maxfield, who stated that Johnson had told him that he could use "sick/emergency" leave while on military leave. On August 29, Lewis again talked with Gregory, and they decided that Maxfield could resign with a severance package or be terminated. On August 30, 2002, Cintas terminated Maxfield.

In July 2003, Maxfield filed a complaint in district court, alleging race discrimination in violation of Title VII, § 1981, and ACRA, and violations of USERRA when Cintas: (1) demoted him from the FOS position to the PST position, (2) placed him in the telemarketing position, and (3) discharged him. Cintas moved for summary judgment. As to the race discrimination claims, Cintas argued that Maxfield's transfer from the FOS position to the PST position was not a demotion or other adverse employment action. In any event, Cintas argued that Maxfield could not present evidence showing that its legitimate reasons for the transfers and the discharge were pretexts for race discrimination. Cintas asserted that it transferred Maxfield from the FOS position to the PST position because he had incurred deficits the four preceding months, transferred him from the PST position to the telemarketing position because Cintas had eliminated the PST position, and discharged him because he had violated company policy and had been dishonest by requesting sick and vacation leave for the time he was on military leave. As to the USERRA claims, Cintas argued that Maxfield could not establish a prima facie case as to the transfer because the transfer from the FOS position to the PST position was not covered by the Act. In any event, Cintas asserted that Maxfield could offer no evidence to show that his military service was a substantial or motivating factor in its decisions to transfer or discharge him, and that it would have taken the same actions in the absence of Maxfield's military obligations.

The district court granted Cintas's motion for summary judgment. As to the race discrimination claims, the district court assumed that Maxfield had established prima facie cases, but held that he failed to present evidence to show that Cintas's legitimate, nondiscriminatory reasons for its actions were pretexts for race discrimination. As to the USERRA claims, the district court held that, assuming the the transfer from the FOS position to the PST positon was a covered action, Maxfield had failed to offer evidence showing that his military service was a substantial or motivating factor in Cintas's actions in transferring and terminating him.

**DISCUSSION**

This court reviews a district court's grant of summary judgment de novo. Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002). "We must affirm if, viewing the record in the light most favorable to [Maxfield], there are no genuine issues of material fact and [Cintas] is entitled to summary judgment as a matter of law." Id.

I. Title VII, § 1983 and ACRA claims

Title VII, § 1981, and ACRA claims are analyzed under the burden-shifting framework set forth in McDonnell Douglas. See EEOC v. Kohler Co., 335 F.3d 766, 772 (8th Cir. 2003) (Kohler) (applying McDonnell Douglas to Title VII claim); Putnam v. Unity Health Sys., 348 F.3d 732, 735 n.2 (8th Cir. 2003) (applying McDonnell Douglas to § 1981 claim); Crone v. United Parcel Serv., Inc., 301 F.3d 942, 945 (8th Cir. 2002) (applying McDonnell Douglas to ACRA claim). As relevant in this action alleging discriminatory demotions and discharge, under the McDonnell Douglas framework, a plaintiff first has to establish a prima facie case by showing that he or she: (1) is a member of a protected group; (2) was meeting the legitimate expectations of the employer; (3) suffered an adverse employment action; and (4) under circumstances permitting "an inference of discrimination." Zhuang v. Datacard Corp., 414 F.3d 849, 854 (8th Cir. 2005). If the plaintiff establishes a prima facie case, the defendant must articulate a legitimate, nondiscriminatory reason for the action. Kohler, 335 F.3d at 772-73. If the defendant does so, the plaintiff must offer evidence showing that the defendant's legitimate reason is merely a pretext for discrimination. Id.

Maxfield argues that the district court erred in granting summary judgment on his claims that Cintas had discriminated against him on the basis of race when it demoted him from the FOS position to the PST position. Cintas argues that Maxfield

7

could not establish prima facie cases of race discrimination, because the transfer was not a demotion or otherwise an adverse employment action. As to Maxfield's race discrimination claims, we need not address Cintas's argument. Like the district court, we will assume that Maxfield established prima facie cases. Maxfield does not dispute that Cintas articulated a legitimate, nondiscriminatory reason for the transfer–Maxfield's four consecutive months of commission deficits. We agree with the district court that Maxfield failed to offer any evidence showing that the reason was a pretext for race discrimination. Although Maxfield points to the fact that a white sales representative, Lynn Clayton, ran a deficit for two months and was not transferred, Maxfield ran a deficit for four months. Thus, Clayton was not similarly situated to Maxfield "in all relevant respects." Kohler, 335 F.3d at 776 (internal quotation omitted). Nor did Maxfield present other evidence that would allow a reasonable fact-finder to infer that Cintas's decision to transfer him from the FOS position to the PST position was based on his race.[1]

Maxfield next argues that the district court erred in granting summary judgment on his claims of a racially discriminatory discharge, asserting that he presented sufficient evidence for a jury to find that Cintas's reasons for the discharge–violation of company policy and dishonesty–were false. However, even if Cintas's reasons are false, Maxfield offered no evidence that Cintas discharged him because of his race, as he was required to do. In St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993), the Supreme Court made clear that "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." As the district court held, Maxfield "failed to bring forth evidence from which a reasonable jury could find that the real reason for

_____

[1]On appeal, Maxfield does not seriously challenge his transfer from the PST position to the telemarketing position. He offers no evidence that the elimination of the PST position at Cintas facilities throughout the Southeast was a pretext for race discrimination or that in eliminating the position Cintas was motivated by his military status.

his termination was racial bias." Thus, even if Cintas "did not convey the true reason for [Maxfield's discharge], summary judgment [wa]s still proper." O'Sullivan v. Minnesota, 191 F.3d 965, 969 (8th Cir. 1999).

II. USERRA Claim

Maxfield also argues that the district court erred in granting Cintas's motion for summary judgment on his USERRA claims. "USERRA, enacted in 1994 to improve the Veterans' Reemployment Rights Act ('VRRA'), prohibits employment discrimination on the basis of military service." Gagnon v. Sprint Corp., 284 F.3d 839, 852 (8th Cir. 2002) (Gagnon), abrogated on other grounds, Desert Place, Inc. v. Costa, 539 U.S. 90 (2003). An employer violates USERRA "when a person's membership in the uniformed services is a motivating factor in the employer's action, 'unless the employer can prove that the action would have been taken in the absence of such membership, . . . or obligation for service.'" Id. (quoting 38 U.S.C. § 4311(c)(1)). "Unlike the McDonnell Douglas framework [utilized in Title VII claims], the procedural framework and evidentiary burdens set out in section 4311 shift the burden of persuasion, as well as production, to the employer." Id. at 854. Under USERRA, an employee must make "'an initial showing . . . that military status was at least a motivating or substantial factor in the [employer's] action.'" Id. (quoting Sheehan v. Dep't of Navy, 240 F.3d 1009, 1014 (Fed. Cir. 2001) (Sheehan)). If the employee makes such a showing, "'the [employer] must prove, by a preponderance of evidence, that the action would have been taken despite the protected status.'" Id. (quoting Sheehan, 240 F.3d at 1014).

Maxfield contends that the district court erred in holding that he failed to offer evidence showing that his military status was a motivating factor in Cintas's decision to demote him from the FOS position to the PST position. Cintas argues that we need not decide whether Maxfield's military status was a motivating factor. Cintas asserts that the transfer was not a demotion, but even if it were a demotion, a demotion is not

9

actionable under USERRA. Cintas is mistaken. Although, as Cintas notes, USERRA provides that an employer may not discriminate on the basis of military status in "initial employment, reemployment, retention in employment, [and] promotion," 38 U.S.C. § 4311(a), it also prohibits discrimination as to "any benefit of employment by an employer on the basis of [military] membership, . . . performance of service, . . . or obligation." Id. USERRA defines "benefit of employment" very broadly as "any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary for work performed) . . . , and includes . . . awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment." Id. § 4303(2). Moreover, "[b]ecause USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries." Hill v. Michelin N. Am., Inc., 252 F.3d 307, 312-13 (4th Cir. 2001) (Hill) (citing, e.g., Coffy v. Republic Steel Corp., 447 U.S. 191, 196 (1980) (predecessor statute VRRA was "to be liberally construed for the benefit of the returning veteran"); McGuire v. United Parcel Serv., Inc., 152 F.3d 673, 676 (7th Cir. 1998) ("USERRA is to be liberally construed in favor of those who served their country.")).

Maxfield argues that by transferring him to the PST position, Cintas denied him a "benefit of employment" because, among other things, the FOS position was a stable job, whereas, in Lunsford's words, the PST position was a "back and forth" position. Indeed, Cintas eliminated the PST position about six months after Maxfield was transferred to it. Maxfield also argues that he was denied a benefit of employment because in the FOS position he had the opportunity to earn bonuses based on his own performance, whereas in the PST position he only could earn bonuses based on other employees' performance. In similar circumstances, the Fourth Circuit has held that a transfer from one position to another was a denial of a "benefit of employment" under USERRA, even though the transfer did not result in the loss of wages and both positions involved rotating work shifts. Hill, 252 F.3d at 312. The court noted that the position from which the plaintiff had been transferred had a "more regular working

schedule" and concluded that "[g]iven the broad reach of USERRA and its purpose of protecting the interests of those serving in the uniformed services, . . . [a] more regular schedule is properly viewed as an advantage of the job under USERRA's definition of 'benefit of employment.'" Id. at 313. Likewise, we conclude that by transferring Maxfield from the FOS position to the PST position, Cintas denied him a benefit of employment under USERRA.

We also agree with Maxfield that the district court erred in holding that he failed to present evidence to show that his military status was a motivating factor in Cintas's decision to transfer him. "In determining whether the employee has proven that his protected status was part of the motivation for the [employer's] conduct, all record evidence may be considered, including [its] explanation for the action taken." Sheehan, 240 F.3d at 1014. For example, "discriminatory motivation under the USERRA may reasonably be inferred from . . . proximity in time between the employee's military activity and the adverse employment action [and] inconsistencies between the proffered reason and other actions of the employer." Id.

Contrary to Cintas's argument, Maxfield presented sufficient evidence as to discriminatory motivation. As to proximity in time, Maxfield was transferred the day he returned from military leave. Cf. Peterson v. Scott County, 406 F.3d 515, 525 (8th Cir. 2005) (in Title VII retaliation case "timing of termination, two weeks from protected activity, is close enough to establish causation in a prima facie case"). A fact-finder also could infer a discriminatory motivation from the telephone call by Lewis's "boss" to Sergeant Grissett inquiring whether Maxfield was present at the military base and whether his presence was "imperative." We also believe that a discriminatory animus could be inferred from the fact that Lewis and Johnson traveled to the military base while Maxfield was on leave to discuss, in part, his sales deficit.

11

Because Maxfield presented sufficient evidence showing that his military service was a motivating factor in Cintas's decision to transfer him to the PST position, the burden shifted to Cintas to show that it would have taken the same action absent Maxfield's military status. Cintas recites that it transferred Maxfield because of his four consecutive months of deficits. However, an employer violates USERRA "when a person's military service is a 'motivating factor' in the discriminatory action, even if it is not the sole factor." Sheehan, 240 F.3d at 1013. Nor does Cintas offer any other evidence that it would have taken the same action absent Maxfield's reserve status. "Because [Maxfield's] transfer. . . must be viewed as a denial of a benefit of employment and because there is a question of fact whether [Maxfield's] [r]eserve status was a motivating factor in the transfer, the grant of summary judgment to [Cintas] on this claim must be reversed." Hill, 252 F.3d at 313.

We also agree with Maxfield that the district court erred in holding that he failed to present sufficient evidence that his military status was a motivating factor in Cintas's decision to terminate him. As to proximity, Maxfield was suspended the day he returned from the three-day leave and discharged a few days later. Sergeant Grissett testified that, as in 2001, someone from Cintas called him in August 2002 asking whether Maxfield was present for duty and whether his presence was necessary.

Moreover, there are numerous inconsistencies in Lewis's explanation that Maxfield violated company policy by requesting emergency and vacation leave while on military leave. Although Lewis testified that Cintas did not allow employees to take sick/emergency leave while on military leave, Johnson, the human resources manager, testified that Cintas allowed employees to take accrued emergency leave while on military leave, that a supervisor did not have the authority to refuse a request for the leave, and that all managers had been so notified. Indeed, when asked "under what circumstances would a supervisor deny an employee from taking their vacation and sick leave and whatever accrued leave they have while on military duty," Johnson, replied,"There are no circumstances if requested." Appellant's App. at 157-58. It is surprising that in his deposition Lewis testified that he had learned nothing during his

investigation that caused him to change his mind that Maxfield had violated company policy by requesting sick/emergency leave while on military leave, but Johnson testified that he participated in the investigation, and a reasonable inference would be that Johnson would have informed Lewis that an employee could take accrued emergency leave while on military leave.

There are also inconsistencies in Lewis's explanation that Maxfield had been dishonest in devising a scheme to "steal" extra sick and vacation days by requesting leave from Anderson. Indeed, Lewis did not even contact Anderson to determine whether Maxfield had called her to tell her that he was "out sick," or whether he told her he wanted to take his accrued sick/emergency leave while on military duty. In addition, Lewis testified that because the requirement that employees had to sign weekly time reports was new, Maxfield would have "no idea" that Lewis would see Maxfield's signed weekly time report and thus not record the emergency and vacation leave days on his attendance calender. However, Lewis testified that the requirement did not change Cintas's policy that supervisors had to approve all leave requests and approve the weekly time report. Appellant's App. at 276. Lewis also testified that because Maxfield had been a supervisor of hourly employees, he would have known that supervisors had to approve leave and the weekly time sheets. Id. at 179, 275. It is also undisputed that as the payroll clerk Anderson had no authority to process a weekly time report for payment until the supervisor approved the report.

Nor, as Cintas argues, does the fact that it granted Maxfield 15 military leaves of absence in 3 years negate a showing of a discriminatory motive. Indeed, a jury could infer that because it had granted the leaves, many of which were, in Lewis's words, "last minute," Cintas was looking for a reason to discharge Maxfield because of the large number of absences from work due to Maxfield's reserve status. See Leisek v. Brightwood Corp., 278 F.3d 895, 900 (9th Cir. 2002) (jury could infer "military status was a 'motivating factor' in [employer's] decision to terminate [plaintiff's] employment due to its concern regarding the significant number of

13

absences from work that [his] participation in the [National Guard] program required").

Because Maxfield satisfied his initial burden to show a genuine issue of material fact concerning Cintas's motivation, the burden of production and persuasion shifted to Cintas to show that it would have terminated Maxfield even in the absence of his military status. We believe that Cintas's evidence concerning the circumstances of Maxfield's leave request is sufficient to create a genuine issue of fact as to whether it would have terminated Maxfield in any event.

**CONCLUSION**

For the reasons stated, we affirm the district court's grant of summary judgment as to Maxfield's racial discrimination claims under Title VII, § 1981, and ACRA. However, we reverse and remand the grant of summary judgment as to Maxfield's USERRA claims to the district court for further proceedings consistent with this opinion.

_____