# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1137

_____

Myron Canady,      *
                            *

         Appellant,      *

                            *    Appeal from the United States

     v.                       *    District Court for the

                            *    Western District of Missouri.

Wal-Mart Stores, Inc.,      *
                            *

         Appellee.      *

_____

Submitted: December 15, 2005
Filed: March 17, 2006 (Corrected: 3/30/06)

_____

Before WOLLMAN, LAY, and RILEY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Myron Canady appeals from the district court's[1] grant of summary judgment to Wal-Mart Stores, Inc. (Wal-Mart) on his race-based employment discrimination and hostile work environment claims. We affirm.

## I.

Canady, an African American, worked at the Springfield, Missouri, Wal-Mart as a produce associate from June 2001 until he was terminated in December 2001.

_____

[1]The Honorable Richard E. Dorr, United States District Judge for the Western District of Missouri.

Canady's duties included stocking, cleaning, and maintaining the floors. Paul Smith was Canady's direct supervisor, and Smith reported to Marlan Kirch, a co-manager. Rick Risenhoover was the general manager of the Springfield Wal-Mart.

Shortly after being introduced to Canady, Smith referred to himself as a "slave driver" when describing his reputation as a manager within the store. Approximately one week after Canady reported the comment to Kirch, Smith met with Canady to discuss the matter and apologize for the comment. Later that summer, Smith, mimicking the actors in the film Rush Hour, asked Canady, "What's up, my nigga?" This occurred in the break room, and Canady did not complain at the time of the incident. In his affidavit, Canady alleges that Smith also referred to him as a "lawn jockey," stated that all African Americans look alike, and remarked that Canady's skin color seemed to wipe off onto towels.

On September 23, 2001, Canady and two other Wal-Mart associates were scheduled to work in the produce department. One of the associates left without permission, and Dennis Brown, the manager on duty, excused the other for a family emergency. When Brown explained to Canady that he would be the only associate in the produce department that night, Canady became upset. Brown asked Canady to write down his complaints so that management could address the situation. Canady submitted a letter to Brown later that night, stating that the day shift was not fulfilling its responsibilities. The next day, Risenhoover, Kirch, Smith, and Canady attended a meeting to discuss Canady's complaints. At the meeting, Canady mentioned the "What's up, my nigga?" comment, and Smith apologized. Following that meeting, Smith did not use that phrase again.

On December 17, 2001, Canady was eating an orange in the food preparation area. Wal-Mart's policy prohibits eating in that area, and inspectors had recently cited the Springfield store for having an aluminum can in the food preparation area. When Brown asked Canady to stop eating, Canady began arguing loudly with him. In

response to Brown's call, Kirch came to the produce department. Canady continued to yell in front of customers and other associates, whereupon Kirch suspended him for the remainder of the day.

Kirch investigated the incident and spoke with the district manager and personnel in the loss prevention department. He then obtained approval from Wal-Mart's corporate office to terminate Canady. After conferring with Kirch, Risenhoover decided to terminate Canady for gross misconduct and insubordination. On December 18, 2001, Kirch informed Canady of Risenhoover's decision.

## II.

We review *de novo* the district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party. Zhuang v. Datacard Corp., 414 F.3d 849, 854 (8th Cir. 2005). We conclude that summary judgment is proper only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Zhuang, 414 F.3d at 854.

## A.

Canady contends that the district court erred in granting summary judgment on his employment discrimination claim because Smith's comments constituted direct evidence of unlawful race discrimination. We disagree. To present direct evidence of discrimination, Canady must establish evidence "sufficient to permit the factfinder to find that [the discriminatory] attitude was more likely than not a motivating factor in the employer's decision." Simmons v. Océ-USA, Inc., 174 F.3d 913, 915 (8th Cir. 1999). Smith's use of the term "slave driver" and the phrase "What's up, my nigga?" could well be considered racially offensive. Smith, however, was not involved in Risenhoover's decision to terminate Canady. It was Kirch's decision to suspend Canady and Risenhoover's decision to terminate him. Absent a causal link between the racial comments and the adverse employment action, Smith's comments are best

classified as, "statements by a decisionmaker unrelated to the decisional process." Id. at 916 (internal citations and quotations omitted).

Canady also failed to establish indirect evidence of unlawful race discrimination. To survive summary judgment under the burden-shifting approach of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the plaintiff must establish a prima facie case of employment discrimination. Id. at 802. If established, the employer may advance a legitimate, nondiscriminatory reason for the employee's discharge. Id. The burden of production then returns to the plaintiff to show that the employer's reason is a pretext for racial discrimination. Id. at 804.

We agree with the district court that Canady did not establish a prima facie case of race-based employment discrimination. To establish a prima facie case, a plaintiff must show the following: (1) he was a member of a protected group, (2) he was meeting the legitimate expectations of his employer, (3) he suffered an adverse employment action, and (4) there are facts that permit an inference of discrimination. Zhuang, 414 F.3d at 854. The parties agree that Canady is a member of a protected group and that he suffered an adverse employment action when Wal-Mart terminated him. The parties dispute whether Canady was meeting the legitimate expectations of Wal-Mart, but even if he was, Canady has not shown that there are facts that permit an inference of discrimination. Canady merely stated his belief that he was treated differently than similarly situated Caucasian employees. Canady presented no evidence that Wal-Mart treated other insubordinate employees differently, and Wal-Mart has presented evidence of several Caucasian employees who were terminated for conduct that was less egregious than Canady's.

Even if Canady had established a prima facie case, Wal-Mart has articulated a legitimate, nondiscriminatory reason for its actions. Wal-Mart terminated Canady because he was insubordinate. He refused to comply with a manager's reasonable request, and he yelled at the manager in front of other associates and customers. Most

importantly, Canady has not presented any probative evidence that Wal-Mart's decision to terminate him was a pretext for unlawful discrimination. Smith's remarks were made outside of the decision making process. Without more, the comments are "not enough to create a trialworthy issue of pretext." Simmons, 174 F.3d at 916 (internal citations and quotations omitted).

**B.**

Canady also contends that the district court erred in granting summary judgment on Canady's race-based hostile work environment claim. "To satisfy the high threshold of actionable harm, [Canady must show that] his workplace was permeated with discriminatory intimidation, ridicule, and insult." Elmahdi v. Marriot Hotel Servs., Inc., 339 F.3d 645, 653 (8th Cir. 2003) (internal citations and quotations omitted). "[M]ere utterance of an . . . epithet that engenders offensive feelings in a[n] employee . . . does not sufficiently affect the conditions of employment" to give rise to a triable hostile work environment claim. Id. (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Taking Canady's allegations as true, Smith's comments were offensive, but insufficient to meet the threshold of actionable harm.

In so holding, we of course recognize, as cited by Judge Lay in his dissent, the Supreme Court's recent decision in Ash v. Tyson Foods, Inc., 2006 WL 386343 (per curiam), in which the Court held that the Eleventh Circuit had erred in holding that modifiers are necessary in all instances to render the word "boy" probative of bias. Id. at *2. The Court went on to hold that, although the use of the word "boy" will not always be evidence of racial animus, the word must be considered in context. Similarly, in certain contexts, the term "slave driver" could be considered evidence of racial animus. There is nothing in the context of this case, however, to suggest that the term was probative of bias, for Smith used "slave driver" to describe his reputation as a manager. Smith apologized after Canady complained, and he did not use the term again. Likewise, as set forth above, when Canady mentioned during the September 24 meeting the "What's up, my nigga?" remark, Smith apologized for having made

the comment and thereafter did not repeat it. In light of these facts, then, we conclude that, however ill-chosen Smith's comments, including his other earlier-described racially tinged statements, and however ill-advised his attempts at racial humor, Smith's conduct did not give rise to an actionable claim of racial hostility.

The judgment is affirmed.

LAY, Circuit Judge, dissenting.

I respectfully dissent. The majority opinion sets a new and dangerous precedent for this circuit. It should be overruled. The majority overlooks that summary judgment is a disfavored standard which "should seldom be utilized" in employment discrimination cases. Pope v. ESA Servs., Inc., 406 F.3d 1001, 1006 (8th Cir. 2005). As long as a reasonable jury could find that Canady was the victim of a racially hostile work environment and was terminated under circumstances that create an inference of unlawful discrimination, we are obligated to allow both his claims to be submitted to a jury. Id. In this case, there is more than ample evidence to submit both claims to a jury.

Regarding Canady's hostile work environment claim, this is not a case where a singular, isolated comment is the source of plaintiff's action. The facts show that Canady's immediate supervisor, Assistant Manager Paul Smith, a Caucasian, repeatedly called Canady a "lawn jockey" and used the word "nigger" in front of Canady and other employees. The term "lawn jockey" is especially offensive and, given Smith's "repeated" use of this term, coupled with his use of the word "nigger," there is enough evidence to demonstrate Canady was the victim of a hostile work environment. See Delph v. Dr. Pepper Bottling Co., 130 F.3d 349, 357 (8th Cir. 1997). Smith also engaged in further racially inappropriate behavior. On one occasion, Smith greeted Canady with the phrase, "What's up my nigga?" in an apparent attempt to make a joke by quoting a movie line. During his initial meeting

with Canady, Smith described his management style as that of a "slave driver." Smith also told Canady and another African-American employee that a black man's skin color rubs off on a towel when he sweats. Finally, Smith remarked to another African-American employee that "African-Americans all look alike."[2] Although this statement was made outside Canady's presence, hostile work environment claims are assessed based on the totality of the circumstances, taking into consideration the nature of the workplace environment as a whole. Therefore, "evidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination." Leibovitz v. New York City Transit Auth., 252 F.3d 179, 190 (2d Cir. 2001).

In Ross v. Douglas County, 234 F.3d 391 (8th Cir. 2000), this court upheld a jury's hostile work environment finding where, during the final two years of plaintiff's seven-year employment tenure, his supervisor repeatedly addressed him as "nigger" and "black boy." Id. at 396-97; see also Ways v. City of Lincoln, 871 F.2d 750, 755 (8th Cir. 1989). Similarly, Canady was repeatedly called a racially humiliating epithet by his supervisor. Harassment by a supervisor "has a greater power to alter the environment" than similar actions of mere co-workers. Hocevar v. Purdue Frederick Co., 223 F.3d 721, 728 (8th Cir. 2000). In contrast to the plaintiff in Ross, Canady was the victim of Smith's racial harassment from the very onset of his short employment with Wal-Mart, when Smith first described himself to Canady as a "slave-driver." Although this comment, by itself, may be innocuous, Smith's subsequent statements suggest this remark may well have been tinged with a racial animus. Finally, Smith's harassment was concentrated over a seven-month period.

I take issue with the majority's conclusion that Smith's apology to Canady for saying "What's up, my nigga?" in some way absolves Smith for making this improper

---

[2]The instances of misconduct cited in this dissent involve either specific instances of Smith's misconduct or a corroborated pattern of misconduct by Smith.

remark. Although apologies, to be sure, must be factored into the hostile work environment calculus, they are by no means a panacea for harassment that has already occurred. Moreover, the significance of Smith's apology in this instance is minimal. In addition to this statement, the record indicates, and I have already highlighted, how Smith repeatedly made reference to Canady using highly inappropriate and offensive racial remarks. Yet at no time did Smith apologize for these statements. Therefore, I respectfully disagree with the majority. Smith's apology, in this instance, does little to change the severity or pervasiveness of the racial harassment Canady was forced to endure.

Regarding Canady's racial termination claim, the above-mentioned facts provide enough evidence to make out both a prima facie case of discrimination and to show that Wal-Mart's proffered legitimate, non-discriminatory reason for Canady's termination is merely pretextual. The "burden of establishing a prima facie case of disparate treatment is not onerous." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). The majority assumes Canady has failed to demonstrate a prima facie case because he did not show that similarly situated white employees were treated differently than he. However, "evidence of disparate treatment is not the exclusive means by which a plaintiff may establish an inference of discrimination." Allen v. Interior Constr. Servs., 214 F.3d 978, 982 (8th Cir. 2000). Instead, this court may properly consider "any credible evidence tending to establish that an employer acted adversely to an individual 'on account of' his disability." Id. Here, the allegations detailing Smith's racially discriminatory conduct provide enough evidence from which a reasonable jury could infer that Canady was terminated under circumstances giving rise to an inference of unlawful discrimination.

There is also enough evidence to show that Wal-Mart's allegedly legitimate reason for Canady's termination was pretextual. Canady may "rely on the same evidence to prove both pretext and discrimination." Brandt v. Shop'n Save Warehouse Foods, Inc., 108 F.3d 935, 939 (8th Cir. 1997). The nature, frequency,

and gravity of the facts alleged are sufficient, in my opinion, from which a reasonable jury could infer pretext. The majority's decision also runs contrary to a recent unanimous opinion by the United States Supreme Court, where the Court held that a supervisor's use of the word "boy," given the proper context, inflection, and tone of voice used, could be offered as evidence to infer pretext even though the word was not used with any accompanying modifiers or qualifications. Ash v. Tyson Foods, Inc., 546 U.S. ___, ___ (2006) (slip op., at 2). Here, the record is replete with evidence of racially malign terms uttered towards Canady that are significantly more serious than those used to show pretext in Ash. The majority also errs by concluding that Canady fails to demonstrate pretext because Smith was not involved in the decision to terminate Canady. A reasonable jury could infer, however, that Smith, as a supervisor and member of management at Wal-Mart was, in some capacity, involved in the decision to terminate Canady. For example, according to Canady, he requested that Wal-Mart relocate him to another department due to Smith's behavior. Canady frequently asked the store manager, Marlan Kirch, about the status of his transfer request. Mr. Kirch was the manager who ultimately fired Canady for the "orange incident." Finally, the factual underpinnings of the "orange incident," upon which the majority relies to show that Wal-Mart's termination of Canady was legitimate, are disputed in Canady's affidavit. Canady denies disrespecting any member of Wal-Mart management. He also denies knowingly engaging in any form of insubordination. Such denials are sufficient to create genuine issues of material fact, the resolution of which lies within the exclusive domain of a jury.

     I respectfully dissent.

_____