Shirdena M. TWYMON, Plaintiff,

v.

WELLS FARGO & COMPANY, d/b/a Wells Fargo Home Mortgage, Inc., Defendant.

No. 4:03 CV 40728.

United States District Court, S.D. Iowa, Central Division.

Dec. 12, 2005.

Michael J. Carroll, Babich Goldman Cashatt & Renzo PC, Des Moines, IA, for Plaintiff.

Kerrie M. Murphy, Lora L. McCollom, Gonzalez, Saggio & Harlan, LLP, West Des Moines, IA, for Defendant.

## ORDER ON SUMMARY JUDGMENT

GRITZNER, District Judge.

This matter comes before the Court on Defendant's Motion for Summary Judgment (Clerk's No. 27). Plaintiff Shirdena M. Twymon is represented by Michael Carroll. Defendant Wells Fargo Home Mortgage is represented by Lora McCollom. Following a hearing held on November 9, 2005, the matter is fully submitted and is ready for disposition.

## SUMMARY OF MATERIAL FACTS [1]

Shirdena Twymon, the Plaintiff, is an African-American female. Twymon was hired by the Defendant, Wells Fargo Home Mortgage (WFHM), in July 2000, as the Director of Organizational Performance to Human Resources in a WFHM office in West Des Moines. Upon her hire, Twymon's supervisor was Laura Gillund, the Senior Vice President of Human Resources. Gillund worked in Minneapolis, Minnesota. Supervision of Twymon was later transferred to Janelle Cerwick. Gillund and Cerwick are Caucasian females. Phil Hall, an African–American male, served as WFHM's Employee Relations Director.

Twymon was recruited for a position at WFHM by an executive recruiter from Skyron Consulting named Deb Kauffman. At no time was Kauffman employed by WFHM. Twymon claims Kauffman "made jokes" about a black person moving to Des Moines to work because neither WFHM nor Des Moines was very diverse. While WFHM does not deny the occurrence of the statement, it disputes its truth, stating it employs individuals from diverse backgrounds.

Following a series of interviews, WFHM agreed to hire Twymon. Twymon interviewed personally with Gillund, and Twymon admits Gillund was "cordial and professional" during that process. Upon her hire in July 2001, Twymon relocated from Colorado to the Des Moines area. Twymon claims her personal computer and some other belongings were damaged, destroyed, or lost during the move.

From the beginning of her employment, Twymon had the perception that Gillund did not wish to hire her and was "unsupportive, disinterested, distant, [and] cold." She claims Gillund was not available when she needed input or advice and "was not [as] facilitative or mentoring with Twymon" as she was with white employees. Gillund denies this and states that one of the co-workers she allegedly favored is Hispanic. She also points out that she

[1]. The record herein consists largely of accusations and conclusions by the Plaintiff and denials by the Defendant. Accordingly, a discussion of the issues necessarily requires detailed review of the claimed factual issues.

worked in Minneapolis, and Twymon worked in West Des Moines, limiting their interactions. Gillund claims she "tried to support [Twymon] personally and professionally as she adjusted to her new position at WFHM ... [and] made a point to make [her]self available for her if she ever had any questions or concerns."

Twymon claims a co-worker told her that when new Caucasian team members arrived, "there was always a big announcement and a big to-do and hullabaloo and everyone knew they were coming," but no announcement accompanied her arrival. WFHM counters by stating that Gillund circulated an e-mail with Twymon's arrival and position, just as with other newcomers.

When Twymon began, her duties included responsibility for the performance management system, employee development consulting, statistical measures, surveys, feedback, and activities related to organizational performance and organizational change, as well as other duties assigned by Gillund. Twymon claims she was not assigned tasks for which she had been hired but instead "[w]ork[ed] as some sort of secretary" for about two months by setting up appointments for a merger project. Gillund admits Twymon worked on the merger project, but both she and Hall state it is not unusual for new hires to be introduced to the WFHM business model by assisting on various projects.

Twymon was then assigned to the Voice of the Team project (VOTT), an employee satisfaction feedback survey. Many of Twymon's duties for this project coincided with those she was hired to do. However, Twymon claims she was held accountable for data gathering and reporting errors which occurred before she began at WFHM. Twymon claims Gillund told her other employees would view these errors as poor performance on Twymon's part. When Twymon objected to being held responsible, she claims Gillund told her she was "making excuses and fail[ing] to accept responsibility." Gillund claims these errors resulted from Twymon's work. She claims Twymon was to work with outside vendors to generate employee survey reports and help Gillund prepare a presentation regarding the survey. While reviewing Twymon's report in preparation for the presentation, Gillund claims to have uncovered numerous mathematical errors.

Up to that point in her employment, Twymon "felt that [Gillund] favored her employees of Caucasian/European descent." She claims "a double-standard in allowable behaviors" existed. She came to this conclusion based on observations of Gillund's "behavior." For example, Twymon claims Gillund made disparaging remarks about an employee of Polynesian descent, a claim Gillund denies. Twymon also "noted the marked difference between how [Gillund] facilitated Barb Rodriguez[2] in her work and the amount of attention that Barb was able to elicit from [Gillund] versus the relative and pointed indifference that [Twymon] got." Gillund points out that Rodriguez worked in Minneapolis, so Twymon had few opportunities to see them interact.

Twymon claims Gillund permitted Caucasian employees to work flexible schedules while she was not. Twymon was allowed to telecommute during a trip to Cleveland, Ohio, when her mother was undergoing medical care, but her other requests to telecommute were generally denied, while white workers were allowed to

---

2. The parties dispute whether Rodriguez is Caucasian, as Twymon alleges, or Hispanic, as Gillund alleges.

telecommute. WFHM admits that Twymon was permitted to telecommute on her trip to Ohio but denies she asked to telecommute on other occasions.

Twymon recalls an altercation with Gillund following an incident between Twymon and a Human Resources manager as additional evidence that Gillund favored white employees. Twymon claims the manager, whose race is unknown,[3] "got quite verbally abusive" and yelled at her. According to Twymon, she told the manager she did not wish to be treated in that way, but Gillund "chastised and reprimanded [her]" and told her she "[did] not know [her] place." On another occasion, Twymon alleges, a Caucasian employee "yelled at [Gillund] in a meeting, lost her temper, [and] spoke quite disrespectfully, [but Gillund] did nothing."

Twymon claims that a white male co-worker "consistently butchered" her name, so she claims to have "gently" corrected him. According to Twymon, Gillund reprimanded her because she was "rude," but when Twymon mispronounced the name of one of her co-workers, whose name and race are unknown, the co-worker "bit [her] head off in front of everyone, and [Gillund] said nothing." Gillund denies the occurrence of either of these events.

Twymon posits that Gillund's reaction to Twymon's interactions with Randall Russell, a Caucasian co-worker, is additional evidence that Gillund favored Caucasian employees. Twymon and Russell would "talk[ ] every day" at work, "hav[e] lunch ... every day," and "always [went] out." Twymon claims other employees complained that she was spending too much time with Russell. Gillund then allegedly told Twymon she needed to spend time with him away from work where they would not be seen. Twymon claims Rus-

sell told her he had not been similarly reprimanded.

Twymon also complains of "rude, condescending, [and] unpleasant" treatment by her co-workers but does not provide any specific examples. When Twymon complained to Gillund, Twymon claims Gillund told her "they were temperamental and [Twymon] was just going to have to learn how to deal with it." She claims to have "always [been] directed by [Gillund] to be accommodating and nice ... while these white individuals were consistently allowed to be rude and condescending and patronizing, and it was okay." According to Twymon, her co-workers (specifically Sarah Black and other "unknown individuals") had a problem with her dating white men, so they started a "campaign" to find a "suitable" black man for her. Upon notifying Gillund, Twymon claims she could not "see what the problem was." Gillund denies having been told about a "campaign" or having made comments to Twymon about such a campaign.

Twymon also claims Hall treated her differently than white employees. At one point, Twymon does not say when, Twymon claims Hall advised her to develop "two personas" as follows:

> One, the person that [she] really was; an intelligent, outspoken, professional black female. And the second one being that knew how to be deferential, knew how to keep her head down, knew how to behave—as he put it—and as a good black so that [she] would be accepted by the Caucasians at Wells Fargo. As [Hall] put it, "Learn to look down and shuffle your feet a little bit, you'll get along a lot better here."

According to Twymon, Hall told her "intelligence and outspokenness in black employees was not welcomed [at WFHM]."

---

**3.** *See* Pl.'s Dep. 77:7–78:4, June 9, 2005.

Hall also allegedly warned her that "qualities that would make a Caucasian a golden child, being aggressive and intelligent and outspoken and a go-getter, would do exactly the reverse to a person of color." Twymon asked if she should "act[ ] like an Uncle Tom," and Hall said she should. Hall denies making these comments. Twymon claims to have reported this incident "[t]o people at Wells Fargo or to people outside Wells Fargo" but does say to whom or when.

Gillund claims Twymon never complained about any mistreatment. WFHM points to Twymon's answer to an interrogatory where Twymon testifies that "other than this lawsuit, the only complaint Plaintiff made occurred . . . in September 2001."

In February 2001, Gillund administered a year-end appraisal of Twymon's work. Twymon's overall rating was high, but Gillund referenced errors on the VOTT project and identified areas for Twymon to improve her performance. Gillund discussed her ability to define process timelines and to follow projects through to completion. Twymon claims she objected to her rating on the VOTT project and to the inclusion of comments criticizing her "values system," and how that system "did not fit in" with how Gillund thought Twymon should be behaving. When Twymon asked Gillund to remove those comments, she did. When Twymon asked if white employees' reviews included similar assessments, Twymon claims Gillund answered in the negative. Gillund claims she usually does not include personal remarks or comments in appraisals and does not evaluate white employees differently than employees of other races. She also states she does not recall discussing Twymon's "values system." A draft of the appraisal including the allegedly inappropriate comments is not in the record.

Gillund claims to have continued to express concerns about Twymon's work performance from February 2001 through July 2001 by voicing concerns about her attendance at work and meetings and her failure to complete work on time. She claims to have "coached Twymon regarding work performance and attendance issues."

In September 2001, Twymon attended a meeting which Brad Blackwell, Vice President of Pacific Markets, attended telephonically. During the meeting, Blackwell made a comment about recruiting quotas for minority home mortgage consultants in California. According to Twymon, he noted, "We can't send white guys into east L.A. to sell mortgages to these people. You've got to send one of their own kind." Twymon interpreted Blackwell's comment as disparaging to blacks and Hispanics. WFHM admits Blackwell made this comment but denies it was directed at Twymon, or that it illustrated a discriminatory animus on his behalf, in part because Blackwell was initially unaware of Twymon's race, as he attended the meeting telephonically.

Twymon alleges Blackwell made other derogatory statements but does not say what they were. Seeking a "discreet and delicate way of telling Mr. Blackwell that his comment wasn't exactly appropriate," Twymon told Blackwell, "Being a member of the group to which you are referring, frankly I am offended." Twymon contends Blackwell became "defensiv[e]" and "angry." Twymon then left to find Hall, who joined the meeting, assumed a "mediatorial role," and "tried to smooth things out with Mr. Blackwell." Twymon claims Hall later "expressed dismay" about Blackwell's statements.

Hall investigated the matter and determined Blackwell "did not behave inappropriately." Upon interviewing others at the

meeting, Hall determined "it was Twymon who behaved inappropriately." Hall's investigation showed her response "was inappropriate and [she] . . . had embarrassed Blackwell by her intense response." He concluded "Blackwell's comment had not been directed to [Twymon] personally[, instead] he expressed some concerns about marketing WFHM products in certain geographic areas of Los Angeles."

Gillund allegedly told Twymon her behavior was inappropriate and she had embarrassed Blackwell. According to Twymon, Gillund reprimanded her and demanded she apologize. Twymon alleges Gillund told her it was part of her job "to assist Caucasians at Wells Fargo in understanding black people because they were most likely not used to being around us." Gillund denies making this statement.

Gillund conducted Twymon's mid-year performance review in October 2001. The review showed that Twymon "took deadlines . . . very seriously and ensured conclusion" on some projects but was "below expectations" in other areas. In particular, Gillund noted that "HR team members at all levels ha[d] given some concerning feedback on [Twymon]'s behavior" at the Blackwell meeting. Twymon's ability to "defin[e] deadlines and follow through" was also targeted for improvement. Twymon was to "ensure she attends meetings on time or advises the meeting organizer if she'll be late or absent."

The mid-year report indicated Twymon needed to cease "tak[ing] work issues or discussions personally." Gillund informed Twymon she brought a "personal reaction" to the workplace, a practice she should avoid. Twymon claims Gillund told her, "Frankly, Shirdena, I don't get you" or "I don't get you people," and that both Gillund and Cerwick told Twymon her behavior was not "Midwest nice." Gillund and Cerwick deny making these statements.

Twymon infers that the timing and content of her mid-year evaluation were connected to her comments made to Blackwell. WFHM denies this allegation, claiming that because it was not unusual for year-end reviews to occur in the first quarter, mid-year review would occur in the autumn, approximately six months later. Gillund also claims she regularly voiced concerns about Twymon's attendance and failure to complete work on time, so the appearance of those items in her mid-year report should have come as no surprise.

Later in October 2001, Twymon asked for "clarifications" on Gillund's expectations. During a meeting attended by Twymon, Gillund, and Cerwick on November 6, 2001, Gillund allegedly told Twymon her behavior was "inappropriate" and that things were "not going to work." Twymon recalls Gillund discussing "issues" with her performance, specifically, a lack of willingness on Twymon's part to accept responsibility for shortfalls in the VOTT project. Twymon "remember[s Gillund] mentioning that [Twymon] had been late for a few meetings and that was an issue, the fact notwithstanding that Caucasians were late for meetings on a regular basis."

Twymon was offered the opportunity to separate from WFHM under the terms of a Departure Agreement or participate in a Performance Improvement Plan (PIP). Gillund states that "[i]t was not unusual, in an effort to give an employee choices, to offer them a separation agreement [or] the [PIP]." After reading the Agreement, Twymon told Gillund and Cerwick she did not wish to lose her job and would not sign it, so she was placed on a PIP. The PIP set forth an array of goals and a timeline for completing each goal. If Twymon "[f]ail[ed] to demonstrate satisfactory

progress and results" on those goals, the PIP made it clear she could be terminated. Twymon does not claim the PIP contained new or different job responsibilities, or that her pay was reduced as a result of her placement on the PIP.

Twymon claims the PIP was continually revised because each time she met a goal, Gillund changed the plan to make it more difficult. Twymon claims Gillund did this because "she wanted [Twymon] gone and this was her way of doing it." In fact, Twymon claims she asked Gillund if she was trying to get rid of her, and Gillund answered in the affirmative. WFHM admits the PIP was revised but contends each revision occurred at Twymon's insistence. Cerwick claims Twymon asked for "clarifications," and each "clarification" resulted in further delays. Cerwick and Gillund deny making revisions to the PIP on their own volition.

Supervision of Twymon was then transferred from Gillund to Cerwick, who worked in West Des Moines. WFHM claims this change resulted from Gillund's reassignment within the company. This change supposedly "benefitted Twymon because she had a manager close by in the same building who could assist her as needed."

Twymon contends Cerwick, like Gillund, treated her differently than Caucasian employees. For instance, Twymon claims to have made a decision regarding the format for forms used in a project. Twymon claims that when "Caucasian team members complained that [she] made the wrong decision and it wasn't the one they wanted, [Cerwick] turned around and disciplined [Twymon] and corrected [her] verbally for going ahead and making that

decision." Twymon does not provide specific examples of how Cerwick treated Caucasian employees. Cerwick denies she treated Twymon differently than her Caucasian counterparts.

Throughout her time at WFHM, Twymon claims to have had several conversations with Nadia Younes, WFHM's Director of Diversity. According to Twymon, they conversed about the "culture, issues, and roadblocks to a person of color at WFHM." Younes allegedly told her that "she believed that [WFHM] spoke of diversity, but did not practice it." Younes also reportedly stated that "[the WFHM] concept of diversity is, sure, we embrace it as long as everyone is just like us." Twymon also claims Younes warned her to "walk softly" because "they were watching [her] and angling to get rid of [her]." Younes allegedly said that the "aggressive, intellectual go-getting behavior that was valued in Caucasians, especially Caucasian men, ... would not be valued in a black female at Wells Fargo." WFHM denies these statements occurred. There is no direct record from Younes.

In November 2001, an employee complained to Cerwick about Twymon's computer and internet use. Specifically, the employee "alerted Cerwick that Twymon was assisting ... Russell[ ] with his masters' thesis" using her work computer. Twymon admits helping Russell with "statistical questions," and does not deny that she used her work computer to do so. She also claims her personal internet usage during work hours was not significant enough for anyone to complain.[4]

---

4. Twymon claims Sarah Black was one individual who complained about Twymon's internet usage. She relies on a handwritten memo, which indicates an individual named

"Sarah" informed management of Twymon's inappropriate internet use. *See* App. at 46. Unfortunately for Twymon, she can only speculate as to whether this is Sarah Black.

As a result of the complaint, Cerwick requested an audit of the hard drive of Twymon's computer and investigated her internet and e-mail usage. This request occurred on November 20, 2001. She requested an analysis of the period from September 2001 through November 15, 2001. On either November 26 or 27, 2001,[5] Cerwick learned Twymon had visited hundreds of internet sites unrelated to her work. WFHM submits an Internet Investigation Report as evidence of Twymon's excessive personal use of the internet. A perusal of that document reveals hundreds of visits to scores of internet sites appearing to have nothing to do with Twymon's job. These sites were visited by an IP address identical to the one registered to Twymon's computer.

WFHM "later learned that Twymon ha[d] pornographic material on her computer hard drive." WFHM submits photographs of nude and partially nude males, as well as close-up views of male genitalia allegedly found on Twymon's computer hard drive. The record is unclear regarding when WFHM learned of these photographs. WFHM also claims Twymon forwarded an e-mail containing these images to her personal e-mail account.

WFHM has an Electronic Communication Systems Use Policy in place which prohibits "viewing, storing, downloading or forwarding pornographic images or other perceived obscene, racist, or harassing materials" and "sending electronic mail that is obscene, racist, harassing, violent, or otherwise offensive." According to the policy, "[a]ll company electronic communication systems and/or equipment are the company's property [and are] to be used to facilitate the business of the company." The policy warns that "[e]xcessive or inappropriate personal use of the company's electronic communication systems and/or equipment may subject [a] team member to corrective action, which may include termination of employment." The policy does not appear to relate to the security of WFHM's computer systems, but is instead designed to prevent excessive or inappropriate use of WFHM's computers by employees who are supposed to be working. Gillund claims a review of this policy occurred during staff meetings at least twice during Twymon's tenure, and Twymon signed an acknowledgment indicating she read and understood the policy.

Twymon admits visiting a restaurant's web site and a web site about wig making. She claims to have visited a number of retail sites to buy work-related books and a cookie bouquet for her co-workers. She also admits to using the system to look for temporary shelving for a work project. Otherwise, she denies visiting the web sites listed in the report. Twymon points out that any employee with a swipe card could have accessed her computer. According to Cerwick, "[e]ach employee has a unique user name, confidential password and assigned IP address, which are all necessary to log into the system." Cerwick acknowledges that IT Department personnel can access any Wells Fargo computer but notes that no one other than those employees had access to Twymon's password.

Despite denying visiting many of the web sites listed in the report, Twymon claims she had Gillund's permission to use her work computer to replace items lost and damaged during her relocation from Colorado. Gillund concedes that she gave Twymon permission to use her work computer "for limited personal use" but only as a "temporary accommodation." Gillund admits she did not tell Twymon a set number of hours for which she could use

5. *Compare* Cerwick Dep. 6:2–3, Oct. 4, 2005; *with* Cerwick Aff. 3, at ¶ 13.

her computer for personal use but notes that after Twymon completed her ·move, she did not ask if she could continue to use her work computer for personal reasons.

Twymon does not dispute that her computer's hard drive contained pornographic images. She states that she received two inappropriate e-mails from Hall's wife's cousin, Nikki Smith. She states that she immediately complained to Hall because she did not wish to be accused of violating WFHM's internet policy and because she did not wish to receive further e-mails from Smith. Hall denies Twymon complained to him about receiving inappropriate e-mails and did not ask him to tell Smith to stop corresponding with her.

On November 31, 2000, Twymon was terminated for violating WFHM's Electronic Communication Systems Use Policy. Twymon complains that she "personally observed white individuals using their computers for personal things during work hours and no one ever said anything," but she did not complain about this until after her termination. She concludes WFHM's reason for firing her is a "bogus and orchestrated excuse" because "[she] had not used the computer any more excessively than any of the Caucasian team members [at WFHM]."

Following Twymon's termination, John Hollander, a white male, was hired to perform some of her duties. The remainder of her responsibilities were spread among other employees.

Months later, Twymon e-mailed Hall and asked him to review her termination. She complains that she "was wrongfully terminated for complaining about racist behavior in the workplace." She alleges she "received no feedback regarding her performance until after [she] complained about a racist comment made by . . . Blackwell." When she complained, Twymon claims she was told that her "comment

was inappropriate and that people don't mean anything by such comments." She reiterated that "[s]hortly" after the Blackwell meeting, she "received [her] first performance evaluation which criticized her performance," so she "became subjected to stricter work restrictions than other exempt employees." It was "apparent" to her that "the result of [her] complaint about·racist behavior was retaliation toward [her] which culminated in the loss of [her] employment."

Hall forwarded Twymon's concerns to George Innus, a member of Wells Fargo's Employee Relations Group. Innus authored a letter to Twymon explaining her termination resulted from excessive and inappropriate e-mail and internet use. Innes recognized that occasional personal use of the internet was not prohibited, but Twymon did not have permission to use her computer to the extent and nature that she did. Innes cited visits to web sites that were not business-related, including sites discussing "fertility, hair styling, jewelry, dining/cuisine, kitchen products, entertainment, and a celebrity's fan club." He also referenced numerous images violative of the computer policy found on Twymon's computer and the e-mails containing inappropriate content. Innus concluded WFHM did not discriminate against Twymon on the basis of her race.

Twymon filed timely complaints with the Equal Employment Opportunity Commission and the Iowa Civil Rights Commission. She received right-to-sue letters from both agencies and filed a Complaint initiating this action on December 19, 2003.

In her Complaint, Twymon set forth claims of racial discrimination and retaliation. She alleges her race was a motivating factor in her termination as well as disciplinary action taken by her supervisors. She also set forth a retaliation claim,

alleging that she was terminated because she complained of discriminatory practices at WFHM. According to Twymon, this conduct violates Title VII of the Civil Rights Act of 1964, as amended (Title VII), as well as the Iowa Civil Rights Act (ICRA). *See* 42 U.S.C. § 2000e *et seq.* (2000); Iowa Code ch. 216 (2005). She seeks a declaratory judgment that acts of WFHM employees violated Title VII and the ICRA and asks the Court to enjoin such conduct from occurring in the future. She seeks lost wages, past and future compensatory damages, and attorney's fees.

In the pending motion, WFHM seeks summary judgment on Twymon's Title VII and ICRA claims.

## DISCUSSION

### I. Legal Standards for Summary Judgment.

Under Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See* Fed.R.Civ.P. 56(c). An issue of fact is "genuine" if it has a basis in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A genuine issue of fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

If "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). It follows that if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," there cannot be a "genuine issue of material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quotation marks omitted). In such a case, "[t]he moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of [her] case with respect to which [she] has the burden of proof." *Id.* at 323, 106 S.Ct. 2548 (quotation marks omitted).

■ Procedurally, the moving party must inform the Court of the basis for its motion and point to portions of the record showing there is no genuine issue of material fact. *Id.* The moving party is not required to support its motion with affidavits or other materials. *Id.* The resisting party must then show more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Instead, the resisting party must show by admissible evidence that specific facts remain creating a genuine issue for trial. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505; *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 717 (8th Cir. 2000).[6]

6. A quantum of the evidence submitted by Twymon is inadmissible hearsay. For example, Twymon claims to have been told by a co-worker that when Gillund hires an employee, she makes "a big announcement and a big to-do and a big hullabaloo and everybody knew they were coming." Twymon does not offer any additional evidence regarding the scope of

To succeed, WFHM must show the absence of disputed material facts, as well as entitlement to judgment as a matter of law. *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 890 (8th Cir.2005) (citing *Kincaid v. City of Omaha*, 378 F.3d 799, 803 (8th Cir.2004)); *Davis v. KARK–TV, Inc.*, 421 F.3d 699, 703 (8th Cir.2005). As the non-moving party, Twymon receives the benefit of all reasonable inferences drawn from the record. *Singletary*, 423 F.3d at 890 (citing *Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir.2001)); *Davis*, 421 F.3d at 703.

■ Because this is an employment discrimination case, WFHM's motion will be "scrutinized more carefully because of the inherently factual nature of the inquiry and the factual standards set forth by Congress." *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1032 (8th Cir.2005) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505); *see also Jacob–Mua v. Veneman*, 289 F.3d 517, 520 (8th Cir.2002) ("Summary judgment should be cautiously granted in discrimination cases because such cases often depend on inferences rather than on direct evidence."). Simultaneously, the Court is mindful that summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## II. Analysis of Twymon's Racial Discrimination Claim.[7]

■ Title VII makes it unlawful for an employer to "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). It is also unlawful for an employer to use race or color as "a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* § 2000e–2(m). Twymon claims she was disciplined and terminated as a result of her race. *See* Compl. at 5, ¶ 41.

### A. Alternate Methods of Proof.

There are two ways for a plaintiff's Title VII race discrimination case to survive summary judgment. A plaintiff may point to direct evidence of racial discrimination under the framework set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), as

this individual's employment. *See* Fed. R.Evid. 801(d) ("The contents of the statement ... are not alone sufficient to establish ... the agency or employment relationship and scope thereof under [Federal Rule of Evidence 801(d)(2) ](D)."). The record therefore does not show this statement "concern[ed] a matter within the scope" of this unknown individual's employment. *Id.* R. 801(d)(2)(D). The Court cannot consider these claims, or any others consisting of hearsay or speculation. *See Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 801 (8th Cir.2004) (considering "only admissible evidence and disregard[ing] portions of various affidavits and depositions that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions in fact."); *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 982 (8th Cir.2004) (same).

7. Cases brought under the ICRA are guided by federal law and courts' interpretation of Title VII. *Pecenka v. Fareway Stores, Inc.*, 672 N.W.2d 800, 803 (Iowa 2003); *Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999). Although there are differences between the ICRA and Title VII, *e.g.*, *Vivian*, 601 N.W.2d at 873–74, none of those differences are relevant here. Thus, the following analysis simultaneously addresses Twymon's ICRA and Title VII claims.

modified by the Civil Rights Act of 1991.[8] A plaintiff may also identify circumstantial evidence of discrimination under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden-shifting framework. *See Peterson v. Scott County*, 406 F.3d 515, 521 (8th Cir.2005) (setting forth the two tests); *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1045–46 (8th Cir.2005) (same).

## B. The *Price Waterhouse* "Direct Evidence" Approach.

### 1. The Test.

Under the *Price Waterhouse* approach, a plaintiff must "produce[ ] direct evidence of conduct or statements by persons involved in the decision-making process, which indicate a discriminatory attitude was more likely than not a motivating factor in the employer's decision." *Kratzer*, 398 F.3d at 1045–46 (citing *Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. 1775); *accord Cram v. Lamson & Sessions Co.*, 49 F.3d 466, 472 (8th Cir.1995). If the Plaintiff identifies direct evidence of discrimination, the employer must show that it more likely than not would have made the same decisions without considering the illegitimate factor. *Kratzer*, 398 F.3d at 1046 (citing *Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. 1775). However, "[e]vidence of the employer's motives for the action, and whether the presence of a mixed motives defeats the plaintiff's claim, is a trial issue, not intended for summary judgment." *Id.* (citing *Griffith*, 387 F.3d at 735).

" '[D]irect' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Griffith*, 387 F.3d at 736. To meet the requisite level of proof, a plaintiff must produce " 'evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.' " *Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir.2005) (quoting *Russell v. City of Kansas City, Mo.*, 414 F.3d 863, 866 (8th Cir.2005) (quotation marks omitted); *accord Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003) (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir.1997))). "[A]ctions or remarks by the employer that reflect discriminatory intent" are sufficient. *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 859 n. 9 (8th Cir.2005) (Colloton, J., concurring). "[D]irect evidence of intentional discrimination is hard to come by." *Price Waterhouse*, 490 U.S. at 271, 109 S.Ct. 1775 (O'Connor, J., concurring), *cited in Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). Occasionally, though, it exists. *E.g., Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83

---

**8.** Although relevant when considering jury instructions, the Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), has no bearing on summary judgment analyses. *See Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 n. 4 (8th Cir.2005); *Johnson v. AT & T Corp.*, 422 F.3d 756, 760 n. 4 (8th Cir.2005) ("[T]he holding of *Desert Palace* does not affect our application of the *McDonnell Douglas* framework at the summary judgment stage."); *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir.2004) ("[W]e conclude that *Des-ert Palace* had *no* impact on prior Eighth Circuit summary judgment decisions."); *accord Torlowei v. Target*, 401 F.3d 933, 934 (8th Cir.2005); *Van Arkel v. Warren County*, 365 F.Supp.2d 979, 1002 n. 31 (S.D.Iowa 2005). *But see Sallis v. Univ. of Minn.*, 408 F.3d 470, 474–75 (8th Cir.2005) ("Title VII race discrimination cases are tested on summary judgment under either *McDonnell Douglas*, or in a mixed-motive case, under *Price Waterhouse v. Hopkins and Desert Palace*." (emphasis added) (citations omitted)).

L.Ed.2d 523 (1985); *DiCarlo v. Potter*, 358 F.3d 408, 417 (6th Cir.2004).

### 2. Twymon's "Direct Evidence".

■ Twymon identifies several portions of the record purportedly containing direct evidence of race discrimination. She first points to Kauffman's comments that WFHM and Des Moines are not diverse places. However, Kauffman's comments cannot be attributed to WFHM because Twymon has not offered evidence that Kauffman acted on WFHM's behalf. Twymon has also not shown Kauffman was involved with the decision to fire Twymon.[9] *See Yates v. Douglas*, 255 F.3d 546, 549 (8th Cir.2001) (actions of those " 'closely involved in employment decisions' " or who " 'participated in the decisions' " are relevant for determining whether direct evidence of discrimination is present) (quoting *Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir.1991); *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1323 (8th Cir.1994)). The same logic disposes of comments by Younes and Blackwell, because neither participated in the decision to terminate Twymon.

■ Gillund, Cerwick, and Hall were involved in the decision-making process culminating with Twymon's termination. With respect to Gillund, Twymon points to perceived differences between the way she and Caucasian workers were treated. She "suspected" Gillund was not in favor of hiring her. She also claims that she did not perform tasks for which she was hired when she began working at WFHM. Even if true, these facts are not direct evidence of racial discrimination. Twymon's "suspicions" and perceptions are little more than "metaphysical doubt" about factual issues

and are insufficient to generate a jury question. *See Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Additionally, WFHM points out that it is not uncommon for a new employee to work on a variety of tasks to allow them to become familiar with company practices. The record supports this explanation; Twymon was eventually moved into a position where she performed tasks more closely aligned with the reasons given for her hire, and the record does not show persons of other races were assigned tasks coinciding with their job responsibilities upon their hire, or that Twymon was assigned to the duties she was because of her race.

■ Statements Twymon attributes to Gillund also do not amount to direct evidence of discrimination. Twymon claims to have been "reprimanded" by Gillund on numerous occasions. Twymon also claims Gillund told her she "didn't know [her] place," and didn't know how to be "Midwest nice." She also claims Gillund told her to "segregat[e] work from personal [sic] [by not] tak[ing] work issues or discussions personally." Gillund allegedly told her to stop "making excuses and failing to take responsibility" for the VOTT project.

■ "[F]acially race-neutral" comments do not show a racial animus on the part of the person making them. *See Putman*, 348 F.3d at 735. None of the comments above have anything, facially, to do with race, and Twymon has failed to identify factual support for her contention that they do. Twymon has offered no evidence that Gillund's "reprimands" were racially motivated, other than her speculative comments that Caucasian workers were repri-

---

9. Kauffman's statements are also inadmissible hearsay. *See supra* note 6. The record does not show Kauffman was WFHM's "agent or servant." *See* Fed.R.Evid. 801(d)(2)(D) (ex-

empting statements "by [a] party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship").

manded fewer times. "Her place" could merely refer to Twymon's position as Gillund's subordinate or have regard to working with other senior executives at WFHM. Asking an employee to stop making excuses or take responsibility for errors does not expose a discriminatory intent on the part of the speaker, nor does stating that a person is not "Midwest nice." Gillund's recommendation to Twymon that she not take employment issues personally is also not proof of racial discrimination.

 Twymon also identifies the way she was treated by Hall and Gillund as direct evidence of racial discrimination. Unlike her co-workers, Twymon claims Gillund's treatment of her was "unsupportive, disinterested, distant, [and] cold." Twymon argues these differences indicate Gillund "favored" white employees.[10] For example, Twymon claims that when she was discussing an issue with a human resources manager, the manager became verbally abusive and yelled at Twymon. When Twymon indicated displeasure, Gillund "chastised and reprimanded" her. When a Caucasian worker yelled at Gillund, Twymon claims he was not reprimanded. Gillund also allegedly told Twymon that it was her job to "assist Caucasians at Wells Fargo in understanding black people because they were most likely not used to being around us." Twymon claims this conduct is direct evidence of race discrimination.

Twymon also recounts the following conversation with Hall:

> [Hall] told me I needed to develop two personas. One, the person that I really was; an intelligent, outspoken, professional black female. And the second being one that knew how to be deferential, knew how to keep her head down, knew how to behave—as he put it—as a good black so that I would be accepted by the Caucasians at Wells Fargo. As he put it, 'Learn to look down and shuffle your feet a little bit, you'll get along a lot better here.

> . . . . .

> [Hall] told me that intelligence and outspokenness in black employees was not welcomed there. These same qualities that would make a Caucasia a golden child, being aggressive and intelligent and outspoken and a go-getter, would do exactly the reverse to a person of color.

---

**10.** Twymon's argument that white employees were allowed to work flex schedules while minority employees were not cannot be considered as evidence of discrimination. The following exchange from Twymon's deposition is telling:

Q: Was [Younes] allowed to have a flexible schedule?
A: I do not know.
Q: Was she allowed to work from home?
A: I don't know.
Q: How about Arnie Johnson?
A: I cannot answer that.
Q: Do you know whether Phil Hall had flex hours?
A: I do not know.
Q: If you do not know whether those four folks have flex hours or work from home, then why [do you argue] that all minority employees, including those four specific individuals, were not allowed these benefits?
A: Because it was my belief, from what I observed, that they were not allowed.
Q: You don't have any personal knowledge as to whether they asked to work flex time or work from home, do you?
A: I know that [Younes] did . . . but I don't know whether it was granted or not. All I know is what I saw, *but I do not have proof.* Pl.'s Dep. 148:4–149:4, June 9, 2005 (emphasis added). The Court must disregard portions of depositions made without personal knowledge or consisting of hearsay. *See supra* note 6. Although Twymon may have observed others working, she "do[es] not have proof" that others, unlike herself, were allowed to work flex hours.

940

When she asked if she should "act[ ] like an Uncle Tom," Twymon claims Hall told her she should.

WFHM cabins the import of these statements by arguing that even if they were made, they did not occur as part of the decision-making process to terminate Twymon. Instead, WFHM argues, these comments are nonactionable stray comments.

■ The Eighth Circuit has distinguished between "[c]omments which demonstrate a discriminatory animus in the decisional process or those uttered by individuals closely involved in employment decisions, from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." *Rivers–Frison v. Southeast Mo. Cmty. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir.1998) (quotation marks omitted); *accord Saulsberry v. St. Mary's Univ. of Minn.*, 318 F.3d 862, 867–68 (8th Cir.2003). Thus, while Hall and Gillund were involved in the decision-making process to terminate Twymon, Twymon must show these comments occurring *during* the decision-making process for the comments to amount to direct evidence of race discrimination. *See Saulsberry*, 318 F.3d at 867–68 (even if made by a person involved in the decision-making process, "an isolated, stray comment unrelated to the decisional process" is not direct evidence of discrimination).

Twymon offers only hearsay regarding when the decision-making process to terminate her began. She claims Younes told her "to be careful" and warned her that "they were watching [her] and angling to get rid of [her]." These hearsay statements cannot be considered.[11] Instead, the record shows the process to terminate Twymon began after WFHM unearthed evidence of Twymon's excessive and inappropriate use of the internet. Twymon has not offered evidence that the statements above were made after that process began.

■ As a result, Twymon has failed to demonstrate that an "illegitimate criterion" motivated the decision to terminate her. She has failed to prove this point because she only produced "statements by decisionmakers unrelated to the decisional process," *Rivers–Frison*, 133 F.3d at 619 (quotation marks omitted); *Saulsberry*, 318 F.3d at 867–68, and actions which do not amount to direct evidence of racial discrimination. She has also failed to demonstrate a "specific link" between the allegedly racially motivated conduct and statements analyzed above and the decision to terminate her. *Putman*, 348 F.3d at 735.

### 3. Conclusion.

The record does not display direct evidence of race discrimination. As a result, the Court cannot consider Twymon's claims under the *Price Waterhouse* approach. The analysis proceeds under the *McDonnell Douglas* indirect evidence approach. *See Griffith*, 387 F.3d at 736–37 (analyzing claims under *McDonnell Douglas* in the absence of direct evidence); *Van Arkel*, 365 F.Supp.2d at 1002 n. 31 ("This Court will apply the *McDonnell Douglas* standard to those cases … that lack strong (direct) evidence of discrimination.").

### C. The *McDonnell Douglas* "Indirect Evidence" Approach.

---

**11.** Twymon has offered no evidence these statements "concern[ed] a matter within the scope" of Younes' employment. *See supra* note 6.

### 1. The Test.[12]

Under the test set forth in *McDonnell Douglas*, a plaintiff must establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. In a Title VII racial discrimination case, a plaintiff must demonstrate "(1) [s]he is a member of a protected class; (2)[s]he was meeting the employer's legitimate job expectations; (3)[s]he suffered an adverse employment action; and (4) 'similarly situated employees outside the protected class were treated differently.'" *Singletary*, 423 F.3d at 891 (quoting *Shanklin v. Fitzgerald*, 397 F.3d 596, 602 (8th Cir.2005)); *accord Davis*, 421 F.3d at 704; *Philip v. Ford Motor Co.*, 413 F.3d 766, 768 (8th Cir. 2005). The fourth factor requires a plaintiff to point to "facts that permit an inference of discrimination." *Johnson v. AT & T Corp.*, 422 F.3d 756, 761 (8th Cir.2005); *Zhuang v. Datacard Corp.*, 414 F.3d 849, 854 (8th Cir.2005).[13]

If the plaintiff makes out a *prima facie* case, a presumption of discrimination arises. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). A burden of production is then placed upon the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the defendant makes such a showing, the presumption of discrimination disappears, and the plaintiff must then show by a preponderance of the evidence that the employer's proffered reason was pretextual for illegal discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515–16, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. To show an employer's proffered reason was pretextual, a plaintiff must not only "discredit[ ] an employer's asserted reasoning for terminating an employee," she must "show that the circumstances permit a reasonable inference to be drawn that the real reason [for termination] was because of [her] race." *Johnson*, 422 F.3d at 763. The burden upon the defendant is one of production; at all times the burden of persuasion is upon the plaintiff. *Hicks*, 509 U.S. at 509, 113 S.Ct. 2742.

### 2. Analysis.

#### a. Twymon's *Prima Facie* Case.

For the purposes of this motion, WFHM concedes Twymon is a member of a protected class and that she suffered an adverse employment action because she was discharged. WFHM qualifiedly concedes the second element, stating that Twymon was qualified for the position for which she was hired, but her performance slipped

---

**12.** The *McDonnell Douglas* test was left unaltered by *Desert Palace* in the summary judgment context. *See Griffith*, 387 F.3d at 735; *see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 49–51 & n. 3, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003) (applying *McDonnell Douglas* in a post-*Desert Palace* summary judgment situation).

**13.** The Eighth Circuit has also set forth a three factor test. *See Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir.2005) ("[A] plaintiff must establish a prima facie case by showing that he (1) is a member of a protected class, (2) was qualified for his position, and (3) suffered an adverse employment action under circumstances permitting an inference that the action was the result of unlawful discrimination."); *Whitley v. Peer Review Sys., Inc.*, 221 F.3d 1053, 1055 (8th Cir.2000) (same). For clarity, *Johnson v. Ready Mixed Concrete Co.* shall be referred to *infra* as "*Ready Mixed Concrete*," and *Johnson v. AT & T Corp.* shall be referred to as "*Johnson*."

over time. Therefore, to meet her *prima facie* case, Twymon must demonstrate she met WFHM's legitimate expectations and that non-black employees were treated differently, giving rise to an inference of unlawful discrimination. *See Singletary,* 423 F.3d at 891; *Davis,* 421 F.3d at 704; *Zhuang,* 414 F.3d at 854; *Sallis,* 408 F.3d at 475.

### i. Was Twymon Meeting WFHM's Legitimate Job Expectations?

■■■ To satisfy the second element of her *prima facie* case, the record must show Twymon met the legitimate expectations of her employer. As Twymon points out, an employer is not entitled to the services "of the ideal employee, but rather what the employer could legitimately expect." *Keathley v. Ameritech Corp.,* 187 F.3d 915, 920 (8th Cir.1999); *accord Calder v. TCI Cablevision of Mo., Inc.,* 298 F.3d 723, 729 (8th Cir.2002).

■■■ Twymon claims comments in her year-end performance evaluation constitute evidence she was meeting WFHM's expectations. She points out her overall rating was positive. Citing *Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 834 (8th Cir.2002), and *Erickson v. Farmland Indus., Inc.,* 271 F.3d 718, 728 (8th Cir.2001), she argues that a series of positive performance evaluations is evidence she met her employer's legitimate job expectations.[14] Twymon's case is not as strong as the plaintiff's in *Smith.* There, the employee received a favorable review "just days" before she was fired. *Smith,* 302 F.3d at 834. Twymon's positive evaluation occurred nearly eight months before her termination. In *Erickson,* the court recognized that "[a]n employer may choose to rely on recent performance more heavily

than past performance." *Erickson,* 271 F.3d at 728–29. In fact, evidence of a positive review does not necessarily infer that a later negative job review was motivated by a discriminatory animus. *Zhuang,* 414 F.3d at 855; *Erickson,* 271 F.3d at 728–29. Thus, the last performance evaluation Twymon received carries more weight than the earlier review. Her last evaluation was not positive; she received "below expectations" ratings in as many areas (four) as "above expectations" (two) and "met expectations" (two) combined.

Even in the review Twymon relies so heavily upon, there is evidence she was not meeting WFHM's expectations. Even putting references to the VOTT project aside, the review called Twymon's "ability to define the process timeline and execute and follow through ... disappointing." Gillund opined Twymon was "not easily accessible" during the project, and noted that it would be "important" for Twymon to "be more planful and to execute in a timely and accurate manner in order to succeed" in her role.

Many of these problems appeared again in Twymon's mid-year evaluation. The mid-year report addressed not only the Blackwell meeting, but Twymon's lack of administrative follow through. The mid-year evaluation pointed out that Twymon needed to let supervisors know if she would be away from the office and was "to ensure she attends meetings on time or advise[ ] the meeting organizer if she'll be late or absent."

The record shows Twymon's performance deteriorated after the mid-year report to the point she was placed on a PIP.

---

14. Twymon's reliance on these cases at this point in the analysis is technically improper. The passages cited deal with the third stage of the *McDonnell Douglas* analysis. *See Smith,* 302 F.3d at 833–34; *Erickson,* 271 F.3d at 728–29. The cases are nonetheless distinguishable.

The PIP required Twymon to do many of the things the two performance evaluations discussed. She was to be at work from 8:00 a.m. until 5:00 p.m., to communicate unplanned absences to others, to attend meetings on time and well-prepared, and to effectively influence and positively impact relation-ships with co-workers. WFHM persuasively argues that a PIP would have been unnecessary had Twymon met its legitimate expectations.

A failure to cure performance deficiencies, particularly after having been given time to remedy the problem, is evidence of an employee's failure to meet the employer's legitimate expectations. *See Shanklin*, 397 F.3d at 602–03. The fact that many of the same issues surfaced in Twymon's year-end report, mid-year report, and PIP is compelling evidence she was not meeting WFHM's legitimate expectations, and Twymon provides inadequate evidence to the contrary.

Other than the reports, Twymon has nothing more than her own assertions that she was meeting WFHM's legitimate expectations. That is not enough. *Shanklin*, 397 F.3d at 603 (citing *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 (8th Cir.1994), for the proposition that summary judgment is proper if the "nonmoving party's only evidence to rebut [a summary judgment] motion was unsubstantiated statements in [a] deposition"). The record must show Twymon "was actually performing her job at a level that met her employer's legitimate expectations." *Whitley*, 221 F.3d at 1055. The record does not provide factual support to conclude she was, particularly at the time of her termination.

### ii. Were non-black employees treated differently?

Twymon must also "proffer 'specific, tangible evidence' that employees who were 'similarly situated in all respects' to [her] received different treatment from [her employer]." *Philip*, 413 F.3d at 768 (quoting *Rose–Maston v. NME Hosp., Inc.*, 133 F.3d 1104, 1109, n. 4 (8th Cir. 1998); *Gilmore v. AT & T*, 319 F.3d 1042, 1046 (8th Cir.2003)). The similarly situated individuals must not be members of Twymon's class. *Singletary*, 423 F.3d at 891; *Philip*, 413 F.3d at 768.

Our circuit has used a pair of tests to determine if plaintiffs meet this standard. *See generally Rodgers*, 417 F.3d at 851–52 & n. 5 (setting forth and contrasting the two tests). Under the stricter test, individuals must "have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir.2000). Under the more lenient standard, individuals must be engaged in or accused of "the same or similar conduct and [be] disciplined in different ways." *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 857 (8th Cir.2004) (quotation marks omitted). Courts noting the conflict have chosen the latter test when evaluating plaintiffs' *prima facie* cases, pointing out that " 'the burden of establishing a *prima facie* case ... is not onerous.' " *Rodgers*, 417 F.3d at 852 (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). The test adopted here is irrelevant, as Twymon fails the least onerous of the two.[15]

At her deposition, Twymon testified that Caucasian co-workers used the internet and e-mail systems more excessively than she, but they were not terminated. This claim is not referenced in

---

**15.** Twymon's claims that she was not allowed to work flex hours while her white co-workers were is inadmissible speculation, and will not be considered. *See supra* notes 6, 10.

Twymon's brief or statements of undisputed fact. The Court understands it is required neither "to sift through all of the materials to find support for [a party]'s claim," *St. Jude Med. Inc., v. Lifecare Int'l, Inc.,* 250 F.3d 587, 596 (8th Cir.2001), *accord Ross v. Alegent Health,* 380 F.Supp.2d 1029, 1034 (S.D.Iowa 2005), nor construct Twymon's argument for her, *Perry v. Woodward,* 199 F.3d 1126, 1141 n. 13 (10th Cir.1999). Twymon has failed to develop this argument beyond her deposition; thus, this allegation is not considered.[16]

■ Twymon identifies an occasion where a human resources manager was verbally abusive and yelled at Twymon. When Twymon told the manager she didn't wish to be treated in that manner, she claims Gillund chastised and reprimanded her. Twymon also claims that when a white employee lost her temper and yelled at Gillund during a meeting, Gillund did nothing. Twymon did not testify (or offer any other evidence) that the manager was not black. Therefore, Twymon has failed to show the individual she claims was treated differently was outside her protected class. *See Singletary,* 423 F.3d at 891; *Philip,* 413 F.3d at 768. Additionally, Twymon did not act in a "similar" way as her co-workers: unlike the manager or the white employee, Twymon did not lose her temper.

■ Twymon also claims that a white male co-worker "consistently" butchered her name. Twymon "gently correct[ed] him," but Gillund reprimanded her. When Twymon mispronounced another co-worker's name, the co-worker "bit [her] head off in front of everyone," and Gillund did

nothing. Like the example analyzed above, Twymon's behavior did not mirror that of her co-worker's. While it is curious that employees exhibiting emotional responses would not be reprimanded and one who "gently" corrects a co-worker is, and while that practice may seem unfair, "'[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions.'" *Torlowei,* 401 F.3d at 935 (quoting *Wilking v. County of Ramsey,* 153 F.3d 869, 873 (8th Cir. 1998)). These two instances do not show similarly situated individuals were treated differently.

■ Finally, Twymon claims to benefit from an inference of discrimination because she was replaced by a person who is not a member of her class. *See Whitley,* 221 F.3d at 1055 (holding that because a black employee was terminated and replaced by a white employee, an inference of discrimination existed); *Rodgers,* 417 F.3d at 859 n. 9 (Colloton, J., concurring) (arguing that a plaintiff can avoid showing employees situated similarly to the plaintiff were treated differently by "produc[ing] evidence that her position remained open after the discharge and ultimately was filled by a person of a different race." (citing *Hicks,* 509 U.S. at 506, 113 S.Ct. 2742)); *Chock v. Northwest Airlines, Inc.,* 113 F.3d 861, 863 (8th Cir. 1997) (inferring discrimination where positions were filled with individuals not of the plaintiff's race). The record shows that although a white male was hired "to perform some of [Twymon's] duties," her other duties were either eliminated or delegated to other employees. Therefore, Twymon was not replaced by an individu-

---

**16.** Twymon has also failed to produce any evidence other than her own speculation that Caucasian co-workers utilized the internet more extensively than she. For example, she has not produced affidavits from co-workers witnessing others using the internet during their work hours, and she has not produced documentation illustrating other individuals' conduct mirrored hers.

al outside her class; the record shows she was not "replaced" at all.

The record does not show Twymon met WFHM's legitimate job expectations, and it fails to show individuals situated similarly to Twymon were treated differently. Consequently, she has not set forth a *prima facie* case of discrimination under the *McDonnell Douglas* test.

### b. WFHM's Proffered Legitimate, Nondiscriminatory Reason for Terminating Twymon.

Even if Twymon had managed to set forth a *prima facie* case of discrimination, WFHM has produced a legitimate, nondiscriminatory reason for Twymon's termination. *See Reeves,* 530 U.S. at 142, 120 S.Ct. 2097. The Court recognizes "[t]his burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Id.* (quoting *Hicks,* 509 U.S. at 509, 113 S.Ct. 2742).

WFHM claims Twymon was terminated for violating its Electronic Communication Systems Use Policy. It points to an Internet Investigation Report, which shows Twymon visited scores of internet web sites having nothing to do with her job.[17] Defendant also points to a Computer Evidence Examination Log which contains photographs of partially and totally nude men found on Twymon's computer and forwarded to a personal e-mail account.

WFHM states that the investigation was undertaken as a result of a complaint that Twymon was helping Russell with his Masters' thesis. Twymon admits she helped Russell with "statistical questions" but does not deny she helped him with his thesis. Regardless of whether Twymon actually assisted Russell with his course

work, WFHM's reason for initiating the investigation was independent of Twymon's race. The Court also notes Twymon does not accuse the person who initiated the investigation—Cerwick—of any overt or clandestine discrimination in initiating the investigation. In sum, although Twymon claims the reason for her termination was an "excuse," she does not contest WFHM's reasons for initiating the investigation of her internet use.

■ The Electronic Communication Systems Use Policy provides that "[e]xcessive of inappropriate personal use of the company's electronic communication systems and/or equipment may subject the team member to corrective action, which may include termination of employment." The policy prohibits the "viewing, storing, downloading or forwarding pornographic images or other perceived obscene, racist, or harassing materials." Violating a company policy is a legitimate, nondiscriminatory reason for terminating an employee. *See, e.g., Johnson,* 422 F.3d at 762 (company firing employee believed to violate code of conduct by making bomb threats deemed sufficient); *Williams v. Saint Luke's–Shawnee Mission Health Sys., Inc.,* 276 F.3d 1057, 1058, 1059 (8th Cir. 2002) (physical contact between an employee and patients and their families, a violation of company policy, deemed sufficient); *see also Putman,* 348 F.3d at 736 ("'Our cases have repeatedly held that insubordination and violation of company policy are legitimate reasons for termination.'") (quoting *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1135 (8th Cir.1999) (en banc)). WFHM has produced evidence Twymon violated its computer policy. It has there-

---

**17.** Twymon admits visiting some of these sites, claiming those visits were work-related, but denies visiting the rest. However, this is not the time for "credibility assessment[s]";

WFHM's burden is one of production, only. *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097 (quotation marks omitted).

fore produced a legitimate, nondiscriminatory reason for terminating Twymon.

### c. Twymon's Showing of Pretext.

The burden now shifts to Twymon to "either introduce evidence to rebut the employer's justification as a pretext for discrimination, or introduce additional evidence proving actual discrimination." *Sprenger v. Fed. Home Loan Bank of Des Moines,* 253 F.3d 1106, 1111 & n. 4 (8th Cir.2001) (citing *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097). Twymon "must do more than merely discredit[ ][her] employer's asserted reasoning for terminating [her]," *Johnson,* 422 F.3d at 763, she "must offer sufficient evidence for a reasonable trier of fact to infer discrimination," *Mathews v. Trilogy Comms., Inc.,* 143 F.3d 1160, 1165 (8th Cir.1998). Evidence Twymon offers must be viewed in light of WFHM's explanation. *Sprenger,* 253 F.3d at 1111.

"A common way of proving pretext is to show that similarly situated employees were more favorably treated." *Putman,* 348 F.3d at 736. As discussed above, Twymon has failed to generate evidence demonstrating that non-black individuals otherwise similar to herself were treated differently. *See supra* Part II.C.2.a.ii.

Instead, Twymon attempts to discredit WFHM's reason for her termination. Twymon admits visiting at least two nonwork related web sites, but claims she did not visit the remainder. She states that any member of Wells Fargo's IT team can access any computer WFHM owns. She also points out that any employee with a swipe card could access her computer. Unfortunately, she has no evidence buttressing these opinions. The record contains no evidence that someone other than Twymon used her computer.

Twymon also attempts to set forth additional evidence proving actual discrimination. To do so, she reiterates the same facts set forth in her argument asserting that an inference of discrimination can be derived from the way her superiors treated her. Without more, Twymon's argument fails. *See Johnson,* 422 F.3d at 762 (rejecting the "reiterat[ion of] the same 'facts' and circumstances that [the plaintiff] presented (and which [the court] rejected) to support his [pretext] argument"); *see also Sprenger,* 253 F.3d at 1111 (citing *Stuart v. Gen. Motors Corp.,* 217 F.3d 621, 635–36 (8th Cir.2000), for the proposition that "proof possibly sufficient to establish a prima facie case was insufficient to establish pretext").

Twymon cannot demonstrate, by a preponderance of the evidence, that WFHM's proffered reason for her termination was pretextual for unlawful discrimination. *See Burdine,* 450 U.S. at 253, 101 S.Ct. 1089; *Hicks,* 509 U.S. at 510, 515–16, 113 S.Ct. 2742.

### 3. Conclusion.

Twymon has not pointed to facts supporting a *prima facie* case of discrimination under the *McDonnell Douglas* test. Even if Twymon managed to marshal evidence to support an inference of discrimination, WFHM has produced a legitimate, nondiscriminatory reason for her termination, which Twymon has failed demonstrate was pretextual for an unlawful employment practice. Twymon has also failed to produce sufficient direct evidence to allow for an inference of race discrimination. Consequently, WFHM's Motion for Summary Judgment must be granted with respect to Twymon's racial discrimination claim.

### III. Analysis of Twymon's Retaliation Claim.

Title VII also prohibits an employer from discriminating against an em-

ployee for "oppos[ing] any practice made an unlawful employment practice ... or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing ...." 42 U.S.C. § 2000e–3(a). Like her race discrimination claim, Twymon's retaliation claim survives upon a showing of either direct or indirect evidence of retaliation. *See Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 738 (8th Cir.2000) (Beam, J., dissenting in part) (citing *Scott v. County of Ramsey*, 180 F.3d 913, 917 (8th Cir.1999)).

Twymon does not appear to argue that direct evidence of retaliation exists. In her resistance, she argues, that "[i]n addition to proving her claim by direct evidence of *race discrimination*, [she] must prove three elements to prove a *prima facie* case of retaliation ...." (emphasis added). Her mere reference to direct evidence of discrimination does not set forth an argument for direct evidence of retaliation. Additionally, a discussion of a *prima facie* case of retaliation is only relevant in the *absence* of direct evidence.

 In the absence of direct evidence of retaliation, the burden-shifting framework of *McDonnell Douglas* applies. *Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 502 (8th Cir.2005) (citing *Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1078 (8th Cir.2005)); *Wenzel v. Missouri–American Water Co.*, 404 F.3d 1038, 1042 (8th Cir.2005); *Stuart*, 217 F.3d at 634. A plaintiff sets forth a *prima facie* case of retaliation by showing "(1) [s]he engaged in protected activity by either opposing an act of discrimination made lawful by Title VII or participating in an investigation under Title VII; (2)[s]he suffered an adverse employment action; and (3) the adverse action was causally linked to the protected conduct." *Singletary,* 423 F.3d at 892 (citing *Eliserio*, 398 F.3d at

1078–79); *accord Kasper*, 425 F.3d at 502; *Gilooly v. Mo. Dep't of Health & Senior Servs.*, 421 F.3d 734, 739 (8th Cir.2005); *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir.2005); *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 858 (8th Cir.2005). The " 'threshold of proof necessary to establish a prima facie case is minimal.' " *Logan*, 416 F.3d at 881 (quoting *Young v. Warner–Jenkinson Co.*, 152 F.3d 1018, 1022 (8th Cir.1998)).

 If the plaintiff succeeds in presenting a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision. *Kasper*, 425 F.3d at 502; *Gilooly*, 421 F.3d at 739; *Logan*, 416 F.3d at 880. If the employer makes this showing, the burden returns to the plaintiff to show the employer's proffered reason was pretextual for unlawful retaliation. *Kasper*, 425 F.3d at 502; *Gilooly*, 421 F.3d at 739; *Logan*, 416 F.3d at 880. At that point, the plaintiff must " 'present evidence that (1) creates a question of fact as to whether [defendant's] reason was pretextual and (2) creates a reasonable inference that [defendant] acted in retaliation.' " *Logan*, 416 F.3d at 880 (quoting *Smith*, 302 F.3d at 833).

### A. Twymon's *Prima Facie* Case.

### 1. Engagement in Protected Activity.

In her deposition, Twymon states she complained to her supervisors about differential treatment throughout her time at WFHM. This allegation is belied by Twymon's answers to WFHM's interrogatories, wherein she states that the "*only* complaint [she] made occurred verbally to Janelle Cerwick and Phil Hall in September 2001" following the Blackwell meeting. Gillund also denies that Twymon complained throughout her employment at WFHM. Additionally, Twymon believes it was "the *aftermath* of [her] complaint

about Blackwell's racially derogatory comments" that led to her termination, suggesting she admits her earlier complaints (assuming their occurrence) had nothing to do with her termination. Therefore, even if this self-inflicted fact question truly exists, Twymon has failed to demonstrate a connection between her complaints occurring before the Blackwell meeting and her termination.

WFHM concedes Twymon's complaints to her supervisors about Blackwell's comments were activity protected by Title VII. Indeed, such complaints are protected. *See. e.g., Ogden v. Wax Works, Inc.,* 214 F.3d 999, 1007 (8th Cir.2000) (holding that an employee engaged in protected conduct by telling her supervisor to stop offensive conduct). *But see Curd v. Hank's Discount Fine Furniture, Inc.,* 272 F.3d 1039, 1041 (8th Cir.2001) (holding that an e-mail to a supervisor complaining of a co-worker with his pants open tucking in his shirt was not protected).[18]

### 2. Adverse Employment Action.

 Twymon claims her negative mid-year evaluation, her placement on the PIP, and her termination are three separate adverse employment actions. WFHM concedes Twymon's termination was an adverse employment action, but claims neither the negative evaluation nor the PIP were adverse employment actions.

 Only adverse actions rising to the level of ultimate employment decisions are actionable. *Ledergerber v. Stangler,* 122 F.3d 1142, 1144 (8th Cir.1997).

"An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not."

*Davis,* 421 F.3d at 706 (quoting *Sallis,* 408 F.3d at 476). Our circuit recently explained held that " '[a] poor performance rating does not in itself constitute an adverse employment action,' " *Turner,* 421 F.3d at 696 (quoting *Spears v. Mo. Dep't of Corr. & Human Res.,* 210 F.3d 850, 854 (8th Cir.2000)), or else "any negative performance evaluation, because it undoubtedly reflects poorly on the employee ... would itself constitute an adverse employment action," *Baucom v. Holiday Cos.,* 428 F.3d 764, 768 (8th Cir.2005). Reprimands also do not constitute adverse employment actions. *Baucom,* 428 F.3d at 768.

The record does not show Twymon's duties, working conditions, or pay changed as a result of her mid-year evaluation or placement on the PIP. She was apparently permitted to continue working in the same position, performed the same duties, and received the same pay. *See Henthorn v. Capitol Comms., Inc.,* 359 F.3d 1021, 1029 (8th Cir.2004) (no adverse employment action where an employee "continued to receive the same salary and was given the same responsibilities"). Although she contends the PIP went through a number of revisions, Twymon does not argue any particular draft contained responsibilities different from those she previously had. Consequently, her placement on the PIP

---

**18.** Twymon claims she engaged in activity protected by Title VII by complaining to Younes. The record does not show anyone other than Younes and Twymon knew of their conversations before Twymon was terminated, nor does it show Younes was involved in the decision to terminate Twymon. Therefore, even if Twymon's conversations with Younes constituted activity protected by Title VII, Twymon has not demonstrated a causal link between her complaints to Younes and her termination.

does not continue an adverse employment action. *See Givens v. Cingular Wireless,* 396 F.3d 998, 998 (8th Cir.2005) ("[P]lacing [an employee] on a 'performance improvement plan,' without more, did not constitute an adverse employment action."); *Tennant v. Omaha Public Power Dist.,* No. 8:04CV100, 2005 WL 1719690, at *6 (D.Neb. July 22, 2005) (placement on a performance improvement plan following a negative evaluation does not rise to the level of an adverse employment action).

▪ The same analysis disposes of the mid-year evaluation. Although that evaluation was negative, it resulted in no change in Twymon's duties or pay. Moreover, " '[a]n unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.' " *Turner,* 421 F.3d at 696 (quoting *Spears,* 210 F.3d at 854); *accord Henthorn,* 359 F.3d at 1028. Twymon has pointed to nothing suggesting her mid-year evaluation or her placement on the PIP was the basis for her termination. Although the PIP mentioned Twymon could be terminated if she failed to show progress on achieving the goals outlined therein, the record shows WFHM did not use the PIP as the basis for terminating Twymon's employment.

No "tangible change in working conditions that produce[ed] a material employment disadvantage" resulted from either the PIP or the mid-year evaluation. *Davis,* 421 F.3d at 706 (quotation marks omitted). Consequently, neither the PIP nor the mid-year evaluation was an adverse employment action. The only ad-

verse employment action Twymon suffered was her termination.

### 3. Causal Connection Between the Protected Activity and the Adverse Employment Action.

▪ To prove a causal connection between engagement in a protected activity and an adverse employment action, " 'a plaintiff must prove that an employer's retaliatory motive played a part in the adverse employment action.' " *Gilooly,* 421 F.3d at 739 (quoting *Kipp v. Missouri Highway & Transp. Comm'n,* 280 F.3d 893, 897 (8th Cir.2002)). A plaintiff must point to " '[e]vidence that gives rise to an inference of retaliatory motive on the part of the employer.' " *Id.* at 739–40 (quoting *Kipp,* 280 F.3d at 897) (alteration by the *Gilooly* court).

▪ Twymon relies almost exclusively upon the temporal proximity between her complaints to her supervisors and her termination as evidence of a causal link between the two. Even if Twymon began complaining to her supervisors about differential treatment "shortly after" she began working at WFHM, Twymon herself admits that her complaint following the Blackwell meeting was the last time she complained to one of her supervisors.[19] Pl.'s Br. 21 ("[T]he last complaint she made occurred [i]n the [sic] September 2001 during a teleconference meeting with Blackwell and other WFHM employees."). Twymon's termination occurred on November 30, 2001. It is therefore undisputed that at least two months passed between the last time Twymon complained and her termination.

---

**19.** Assuming *arguendo* one could avoid the hearsay problem, *see* footnote 6 *supra,* Younes' comments that WFHM was "angling to get rid of" Twymon still cannot supply a link between Twymon's complaints and her termination because the record is devoid of

any indication as to when these comments occurred. For example, if this comment occurred before the Blackwell meeting, there can be no causal connection between this comment and Twymon's complaint about Blackwell's comments.

Temporal proximity, alone, can create an inference of a causal link only if the proximity is "very close." *E.g., Wallace,* 415 F.3d at 859 (just under one year insufficient); *Zhuang,* 414 F.3d at 856 (just over one month insufficient); *Couty v. Dole,* 886 F.2d 147, 148 (8th Cir.1989) (thirty days sufficient); *Keys v. Lutheran Family & Children's Servs. of Mo.,* 668 F.2d 356, 358 (8th Cir.1981) (less than two months sufficient). Generally, though, "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation," *Kiel,* 169 F.3d at 1136; *accord Zhuang,* 414 F.3d at 856, so courts have been "hesitant" to rely on proximity evidence alone, *Sprenger,* 253 F.3d at 1114. Intervening events separating the protected activity and the adverse employment action reduces the persuasive value of even strong temporal evidence. *See, e.g., Cheshewalla v. Rand & Son Constr. Co.,* 415 F.3d 847, 852 (8th Cir.2005) (holding that intervening events "eroded" the causal connection suggested by the employee). Here, WFHM identifies the discovery of Twymon's excessive personal use of the internet at work as an event separating her complaints about Blackwell's comments and her termination.

The passage of two months between the protected activity, coupled with an intervening (and productive) investigation into Twymon's internet usage requires the conclusion that there is no connection between her September 2001 complaints and November 2001 termination. Twymon has therefore failed to establish a *prima facie* case of retaliation.

### B. WFHM's Proffered Legitimate, Nondiscriminatory Reason for Terminating Twymon.

Even if Twymon managed to establish a *prima facie* case of retaliation, WFHM's reason for terminating Twymon is the same as before: Twymon's violation of its Electronic Systems Information Policy by excessive and inappropriate use of the internet and e-mail system. *See supra* Part II.C.2.b. Because WFHM produced a reason for terminating Twymon that is both legitimate and nondiscriminatory, *see id.,* WFHM has satisfied this element.

### C. Twymon's Showing of Pretext.

Twymon relies on her argument above to show that WFHM's proffered reason to terminate Twymon was pretextual. As Twymon failed to show WFHM's proffered reason for terminating her was pretextual above, *see supra* Part II.C.2.c, her argument fails here as well.

Consequently, WFHM's Motion for Summary Judgment must be granted with respect to Twymon's retaliation claim.

### IV. Conclusion.

Twymon has failed to demonstrate the existence of a genuine issue of material fact on her race discrimination or retaliation claims, and this matter may be resolved as a matter of law. Defendant's Motion for Summary Judgment (Clerk's No. 27) must be **granted**. The above-entitled action is dismissed. The Clerk of Court is directed to enter judgment for the Defendant and against the Plaintiff.

**IT IS SO ORDERED.**